GEORGE S. CARDONA
Acting United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
SANDY N. LEAL (No. 202179)
Assistant United States Attorney
    Ronald Reagan Federal Building and United States Courthouse
    411 West Fourth Street
    Santa Ana, California 92701
    Telephone: (714) 338-3531
    Facsimile: (714) 338-3561
    E-Mail: Sandy.Leal@usdoj.gov

Attorney for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. 08-458(A)-GAF |
|                 Plaintiff, | ) GOVERNMENT'S SUPPLEMENTAL |
| | ) POSITION RE: SENTENCING |
|            v. | ) |
| | ) |
| EVELYN PELAYO, | ) Sentencing:     Oct. 19, 2009 |
| | )                 1:30 p.m. |
|               Defendant. | ) |
| | ) |

    Plaintiff United States of America, by and through Assistant United States Attorney Sandy N. Leal, hereby submits the attached supplemental position regarding sentencing of defendant EVELYN PELAYO.

Dated: Oct. 14, 2009          Respectfully submitted,

                            GEORGE S. CARDONA
                            Acting United States Attorney

                                  /S/
                            SANDY N. LEAL
                            Assistant United States Attorney

**GOVERNMENT'S POSITION RE: SENTENCING**

**I.**

**INTRODUCTION**

On March 23, 2009, defendant Evelyn Pelayo ("defendant") pleaded guilty pursuant to a plea agreement[1] to counts six and eleven, charging her with violations of Title 18, United States Code, Section 1589, Forced Labor, and Title 18, United States Code, Section 1592, Unlawful Conduct with Documents in Furtherance of Forced Labor.

On September 28, 2009, in accordance with the plea agreement, the government submitted its Sentencing Position requesting that the Court impose a 57-month sentence. The government additionally submits this Supplemental Sentencing Position to respond to defendant's request that the Court sentence defendant to time-served and probation for three to five years or home detention, defendant's objection to the calculation of restitution in the Pre-Sentence Report ("PSR"), and to further request that the Court impose a 57-month sentence.

**II.**

**DISCUSSION**

**A.   The Nature And Circumstances Of The Offense Warrant A 57-Month Sentence.**

Defendant argues that nature and circumstances of the offense warrant a probationary sentence. (See Def.'s Memo., p. 7-8). In this regard, defendant urges the Court to consider that (1) defendant provided "room and board" to A.G. and J.D.; (2)

---

[1] Defendant's Sentencing Memorandum incorrectly states that the parties entered into a plea agreement pursuant to Rule 11(c)(1)(C). (Def.'s Memo, p. 1). The plea agreement in this case is a non-binding plea agreement.

defendant treated A.G. and J.D. as "members of the Padolina
family" and invited them to family functions and holiday parties;
(3) defendant "thought she was helping someone less fortunate
that she;" and (4) defendant was not involved with the smuggling
of the workers into the United States.  (Id. at 5, 8).
Defendant's arguments are without merit and demonstrate that
defendant does not truly consider her actions to be egregious and
criminal.

       1.   Requiring Workers to Sleep on Hallway Floors, Living
           Room Couches, and Patients' Rooms in Defendant's Elder
           Care Facility Does Not Equate to "Room and Board"

First, defendant fails to adequately describe the "room and
board" that she provided to her employees/victims.  After
arriving at defendant's elder care facility, J.D. discovered that
he did not have a room in the facility to place his belongings or
to sleep.  (See Exhibit A: January 4, 2008 Interview of J.D., p.
3).  J.D. explained that he often slept on the floor in the
hallways or in patients' rooms after they had fallen asleep.
(Id.).  J.D. also explained that he did not have a place to keep
his clothes.  (See Exhibit B: February 5, 2009 Interview of J.D.,
p. 2).  J.D. stated that defendant told the workers to hide their
personal belongings so that if state licensing officials paid a
surprise visit, they would not discover that the workers were
living at the facility.  (Id.).  Defendant also told them that if
state licensing officials ever asked the workers whether they
lived at the facility, they should lie and say "no."  (Id.).
A.G. similarly described her living arrangements at the elder
care facility stating that she sometimes slept in an empty
patient room, on the couch in the facility's living room, or on

the floor in the hallway.  (See Exhibit C: October 10, 2007
Interview of A.G., p. 5).  A.G. also stated that she could not
leave her personal belongings in one place in the house because
defendant did not want licensing officials to know that the
workers also slept at the facility. (See Exhibit D: February 5,
2009 Interview of A.G., p. 3).  As such, defendant's request for
leniency and a probationary sentence on account of the "room and
board" provided to A.G. and J.D. should be rejected.  To the
contrary, the shameful and miserable living conditions imposed on
A.G. and J.D. by defendant support a low-end Guidelines sentence
of 57 months imprisonment.

    2.   <u>Defendant Treated A.G. and J.D. as Indentured Servants</u>

    Defendant contends that she treated A.G. and J.D. as
"members of the Padolina family" and even invited them to family
functions and holiday parties.  (Def.'s Memo, p. 8).  The
government is hopeful that defendant does not treat her family
the way in which she treated the victims in this case.  From the
moment A.G. and J.D. arrived at defendant's elder care facility,
defendant engaged in a plan to maximize her investment in
smuggling two workers into the United States.  While defendant
paid $6,000 for each worker to be smuggled into the United
States, defendant informed A.G. and J.D. that they each owed her
$12,000 in smuggling fees and that they would need to work for
her for the next ten years.  (PSR ¶¶ 18, 25).  Defendant deducted
$200 to $300 from A.G. and J.D.'s meager monthly earnings to
repay defendant for their smuggling debt.  (PSR ¶¶ 19, 26).
Defendant also immediately confiscated their passports. (PSR ¶¶
20, 27).

1    Defendant informed both A.G. and J.D. of the conditions of
2  their employment and "rules" at her elder care facility.
3  Defendant warned A.G. not to talk to other Filipino nationals,
4  other workers, or family members of the patients.  (PSR ¶ 20;
5  Exhibit C, p. 2).  Defendant told A.G. that if she attempted to
6  run away that defendant would go to the police and tell them that
7  A.G. had stolen something and then the police would put her in
8  jail.  (PSR ¶ 20; Exhibit C, p. 3-4).  Defendant also told A.G.
9  that the police would never believe A.G. because defendant was a
10 United States citizen and A.G. was not.  (See Exhibit C, 3-4).
11    Defendant informed A.G. and J.D. that they should be afraid
12 of the police.  (See Exhibit A, p. 3; Exhibit C, p. 3-4).
13 Specifically, defendant told J.D. that he would be in trouble if
14 the police ever picked him up because he did not have papers
15 legally permitting him to be in the country.  (See Exhibit A, p.
16 3).  Defendant warned J.D. that immigration would jail him and
17 deport him and that if that happened, she "would not do anything
18 to help him."  (Id.).
19    Day after day, A.G. and J.D. worked for defendant almost 24
20 hours a day.  (See Exhibit B, p. 2; Exhibit D, p. 2).  On a
21 typical day, the workers began their day at 5:30 a.m. and worked
22 continuously until approximately 7:00 p.m.  (See Exhibit D, p.
23 2).  Thereafter, the workers would check on the patients every
24 two hours.  (Id.).  Defendant ordered the workers to lie to state
25 inspectors about the hours worked and told the workers to say
26 that they only worked eight hour shifts.  (See Exhibit C, p. 4).
27    In the over two years A.G. worked for defendant, A.G. was
28 never taken on "an outing or out to eat," and never given a

vacation.  (Id. at 3).  While A.G. was given one to two days off per a month,[2] A.G. was essentially limited to walking to the neighborhood stores as she did not have a vehicle, was unfamiliar with the public transportation system, and fearful of the police and immigration due to defendant's warnings.  During the Christmas holiday, defendant gave A.G. and J.D. a $20 gift and invited the workers to her house for food.  (Id.).  However, the workers were required to return to the facility after dinner to provide care for the elder patients.  (Id.).

Defendant did not treat A.G. and J.D. as family but as indentured servants.  Defendant intended to required A.G. and J.D. to work for her for ten years and deducted repayment for their inflated smuggling debt from their monthly salaries. Defendant forced A.G. and J.D. to work at her elder care facility almost 24 hours a day, seven days a week.  Defendant's treatment of A.G. and J.D. as indentured servants warrants a sentence of 57 months imprisonment.

3.   Defendant Smuggled and Forced A.G. and J.D. to Work at Her Elder Care Facility for Her Own Personal Financial Gain

Defendant contends that she "thought she was helping someone less fortunate that she."  (Def.'s Memo, p. 8).  However, none of defendant's actions can be described as "helping" the victims in this case.  Defendant's efforts to "help" A.G. and J.D. included confiscating their passports, instilling fear of law enforcement, threatening deportation, and forcing them to work almost 24 hours

---

[2] The government notes that A.G. and J.D. were given one to two days off per month.  However, a day off was not an entire 24-hour period as they were required to return to the elder care facility at approximately 5:00 p.m. to begin work for the evening.  (See Exhibit B, p. 2; Exhibit D, p. 3).

a day in defendant's elder care facility for well-below minimum
wage pay.  Defendant notified A.G. and J.D. that they would be
required to work for her under these conditions for ten years and
then would be required to return to the Philippines.  Given her
actions, it is clear that defendant was not focused on "helping"
these young Filipino nationals succeed in the United States.
Instead, defendant was focused on profiting from A.G. and J.D.'s
hard work.

Defendant's lack of concern for the workers that she
exploited is also evident in her reaction to J.D.'s departure
from her elder care facility.  After discovery that J.D. had left
the elder care facility without defendant's permission, defendant
filed a false police report with the Long Beach Police Department
alleging that J.D. had stolen $700 and some jewelry from
defendant's home before running away.  (PSR ¶ 28).  Such actions
are not the actions of someone "helping the less fortunate."
Clearly, defendant was motivated by greed and vindictiveness and
not benevolence.

4.   Defendant Conspired with Co-defendants to Smuggle
Victims A.G. and J.D. into the United States

Defendant asserts that she did not conspire with co-
defendants Rodolfo Demafeliz ("Demafeliz") and Rolleta Riazon
("Riazon") to smuggle numerous illegal aliens into the United
States.  (Def.'s Memo, p. 5).  Defendant contends that she was
only involved with A.G. and J.D., and only after their arrival in
the United States.  (Id.).  However, the evidence (including the
factual basis of defendant's plea agreement) clearly establish
that defendant not only conspired with co-defendants Demafeliz
and Riazon to smuggle A.G. and J.D. into the United States to

7

1  work at her elder care facility, but that defendant conspired to
2  smuggle other individuals as well.
3      In the plea agreement, defendant admits that she requested
4  A.G. come to the United States to work at her elder care
5  facilities.  (Plea Agreement, ¶ 8).  Defendant further admitted
6  that, after co-defendant Demafeliz and A.G. entered the United
7  States, co-defendant Demafeliz delivered A.G. to defendant and
8  defendant paid co-defendant Demafeliz $6,000 for his smuggling
9  services.  (Id.).  Similarly, defendant admitted in the factual
10  basis of the plea agreement that alien J.D. was brought to the
11  United States to work for defendant at her elder care facilities.
12  (Id.).  After co-defendant Demafeliz and A.G. entered the United
13  States, co-defendant Demafeliz delivered A.G. to defendant and
14  defendant again paid co-defendant Demafeliz $6,000 for his
15  smuggling services.  (Id.).
16      To support defendant's contention that she was not involved
17  with co-defendants Demafeliz and Riazon and not involved with the
18  smuggling of any individuals into the United States, defendant
19  claims to rely on the deposition of co-defendant Demafeliz.
20  (Def.'s Memo, p. 5).  However, co-defendant Demafeliz testified
21  at the deposition that he smuggled at least six Filipino
22  nationals into the United States for defendant Pelayo.  (See
23  Exhibit E: Deposition of Rodolfo Demafeliz, Volume 1, p. 21-76).
24  Specifically, co-defendant Demafeliz testified that he smuggled
25  Ferdinand Espiritu, Rubenita Reyes, Eden Ronquillo, A.G., J.D.,
26  and Ron Nitura into the United States on behalf of defendant and
27  was paid $6,000 to smuggle each individual.  (Id.).  Co-defendant
28  Demafeliz further testified that he was generally paid the $6,000

8

1   in cash by defendant at the time of delivery of the alien, but

2   recalled that defendant paid him by wire transfer on one

3   occasion.  (Id. at 31, 40-41, 59, 68, 75).  On or about April 3,

4   2008, law enforcement searched defendant's home and discovered a

5   wire transfer receipt indicating a wire transfer of $6,000 to co-

6   defendant Demafeliz.  (See Exhibit F: Lucky Money Wire Transfer

7   Receipt).  Accordingly, defendant not only conspired with co-

8   defendants Demafeliz and Riazon to smuggle illegal aliens into

9   the United States to work at her facilities, but the smuggling of

10  illegal aliens was done at defendant's behest.

11  **B.   A 57-Month Sentence is Reasonable and Would Avoid An
       Unwarranted Sentencing Disparity With Other Defendants**

12  **Guilty of Forced Labor Violations with Similar Records.**

13       Defendant requests that the Court impose a sentence of time

14  served with probation or home detention for the remainder of any

15  sentence or supervised release.  Defendant notes that co-

16  defendants Demafeliz and Riazon received "'time served' sentences

17  of just a few months" and were permitted to return to the

18  Philippines.  (Def.'s Memo, p. 6).  As such, defendant requests

19  "similar treatment."  However, co-defendants Demafeliz and Riazon

20  were not charged with forced labor violations.  Co-defendants

21  Demafeliz and Riazon were charged with smuggling illegal aliens

22  into the United States for financial gain.  While co-defendants

23  Demafeliz and Riazon conspired with defendant to bring illegal

24  aliens into the United States in order to work for defendant, co-

25  defendants Demafeliz and Riazon appear to have been unaware of

26  defendant's treatment of the smuggled aliens/employees and her

27  "terms of employment."  Both co-defendants Demafeliz and Riazon

28  entered guilty pleas pursuant to plea agreements for alien

smuggling.  (See Plea Agreements, Docket Entries ## 63, 68).  Co-defendant Riazon was sentenced to "time-served," consisting of five months and 22 days imprisonment (eight days short of the low-end of the applicable Sentencing Guidelines range).  (See Judgment and Commitment Order, Docket Entry #71).  Co-defendant Demafeliz was also sentenced to "time-served," consisting of seven months and 28 days imprisonment (the applicable Sentencing Guidelines range was 6-12 months).  (See Judgment and Commitment Order, Docket Entry # 104).  After completing their sentences of imprisonment, co-defendant Riazon was deported from the United States to the Philippines and co-defendant Demafeliz was voluntarily returned to the Philippines.  While co-defendants Demafeliz and Riazon committed serious crimes (smuggling aliens into the United States for financial gain), they did not commit forced labor violations.  Because defendant and her co-defendants were not found guilty of similar conduct, their sentences should not be compared when considering the need to avoid unwarranted sentencing disparities.

C.   **The United States Department of Labor Correctly Determined Defendant's Restitution**

Defendant asserts that the Department of Labor's ("DOL") restitution calculation is "predicated upon false information that is contradicted by the evidence."  (Def.'s Memo, p. 2). Specifically, defendant contends that (1) the calculation is based on A.G. and J.D. working seven days a week when they actually only worked six days a week; (2) the calculation credits A.G. and J.D. for working 24 hours a day when they actually worked eight to ten hours a day; and (3) the calculation failed to consider that A.G. and J.D. received room and board.  (Id.).

Defendant's objections to the restitution calculation are without merit.

First, the DOL Summary of Unpaid Wages accounted for two days off per month that both A.G. and J.D. generally received while employed by defendant.[3] (See Exhibit G: DOL Summary of Unpaid Wages).  A review of the DOL's calculation of total hours worked by A.G. and J.D. reveals that DOL based its calculation on A.G. and J.D. working a six-day work week followed by a seven-day work week during the entire period of employment.[4] As such, the DOL restitution calculation adequately accounts for the one to two days off a month provided to A.G. and J.D.

Second, the DOL calculated the backwages owed to A.G. and J.D. based on a 16-hour work day despite the evidence indicating that A.G. and J.D. worked almost 24 hours a day for defendant. As previously discussed, A.G. and J.D. worked for defendant almost 24 hours a day.  (See Exhibit B, p. 2; Exhibit D, p. 2). On a typical day, the workers began their day at 5:30 a.m. and worked continuously until approximately 7:00 p.m.  (See Exhibit D, p. 2).  Thereafter, the workers would check on the patients every two hours.  (Id.).  On their days off, A.G. and J.D. were not given an entire 24-hour period free from work, but instead

---

[3] The government notes that both A.G. and J.D. stated that they did not receive any days off for a four month period. Moreover, on their so-called "day off," A.G. and J.D. were required to return to the facility at approximately 5:00 p.m. to care for the patients in the evening. (See Exhibit B, p. 2; Exhibit D, p. 3).

[4] The Wage Transcription and Computation Sheet indicates the total hours worked by week.  A review of this sheet reveals that A.G. and J.D. worked a 96 hour work week (6 days/16-hour days) followed by a 112 hour work week (7 days/16-hour days) during the period of employment at Vernon Way Care Home.

1    required to return to the facility in the evening to care for the

2    patients.   Accordingly, DOL's restitution calculation based on a

3    16-hour work day was appropriate.[5]

4        Lastly, the DOL restitution calculation correctly provides

5    no credit for the so-called "room and board" provided to A.G. and

6    J.D.   As previously discussed, A.G. and J.D. were not provided

7    with separate quarters from the patients.   To the contrary, A.G.

8    and J.D. usually slept on the floor in hallways or in patient's

9    rooms.

10                                III.

11                             CONCLUSION

12       For all of the foregoing reasons, the government

13   respectfully requests that the Court impose a 57-month sentence.

14

15

16

17

18

19

_____

20       [5] The government notes that a 16-hour work day appears to be
     a conservative calculation of the total hours worked by the
21   victims in this case.   Under the mandatory provisions of 18
     U.S.C. § 1593, defendant is required to pay full restitution to
22   the victims of her offense for the greater of the gross income or
     value to the defendant of the victim's services and labor or the
23   value of the victim's labor as guaranteed under the Fair Labor
     Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq.   Section 29 CFR
24   § 785.22 applies to employees who are on duty for 24 hours or
     more in a day.   Pursuant to this section, [i]f the sleeping
25   period is interrupted by a call to duty, the interruption must be
     counted as hours worked.   If the period is interrupted to such an
26   extent that the employee cannot get a reasonable night's sleep,
     the entire period must be counted.   For enforcement purposes, the
27   Divisions have adopted the rule that if the employee cannot get
     at least 5 hours' sleep during the scheduled period the entire
28   time is working time.   29 CFR § 785.22.

                                  12