FD-1023 (Rev. 6-22-2007)

# FEDERAL BUREAU OF INVESTIGATION

Confidential Human Source (CHS) Reporting Document

Reporting Date: 02/09/2009

Case ID:  50-LA-249037 (Pending)
          270I-LA-250723 (Pending)

Contact Date: 02/05/2009

Type of Contact:    In person

Location:    Los Angeles, California

Written by:  SA Tricia Whitehill

Other(s) Present:   Assistant United States Attorney Sandy Leal, Department of Justice trial attorney Kayla Bakshi, Immigration and Customs Enforcement Special Agent Miguel Palomino, Legal Aid Foundation attorneys Sheila Neville and Yunie Hong, and Tagalog interpreter Zenaida Ramos.

Source Reporting:

At the beginning of the interview, AUSA Leal explained to CHS that it was most important that he tell the truth. CHS is from Nueva Ecija, Gen. Tinio, a small town in the Philippines. He is the fourth of five children. His three brothers and one sister live in the Philippines. He is a high school graduate.

Before coming to the United States to work for Evelyn Pelayo (Pelayo) in May 2007, CHS was working construction on two separate homes that Pelayo was having built in the Philippines. One home was a vacation home in a mango orchard, and the other home was in the city. Both homes were for Pelayo's personal use. CHS obtained the job through a contractor and was paid between 6,000-7,000 pesos/month. He worked regular 8 hour days, and if he worked additional hours he would be paid overtime. CHS met Pelayo and her husband Darwin Padolina (Padolina) more than once when they visited the construction sites. Sometimes he would go out for drinks with Padolina in the Philippines.

CHS's cousin Kris ▓▓▓▓▓ (Kris) went to train with Rudolfo Demafeliz, aka Duden (Duden) after Pelayo called Kris's father Danilo ▓▓▓▓▓ (Danilo) asking if he knew anyone that would be interested in working for her in the U.S. Kris never traveled to the U.S. with Duden because she was not able to pass her interview at the embassy to obtain a visa. Later, Pelayo called Danilo and said she wanted a man to work for her in the U.S. CHS was with Danilo during that phone call. Danilo asked CHS whether he would be interested, and CHS accepted the offer.

**EXHIBIT B**
**18**

CHS Reporting
50-LA-249037 (Pending), 02/05/2009

CHS started training with Duden in April 2007 and traveled to the U.S. on May 20, 2007. Duden created certificates that falsely claimed CHS was a Taekwondo instructor and a black belt. Duden and Rolleta Riazon (Riazon) took CHS to the embassy for his visa interview. CHS passed his interview to obtain a visa on his first try. The visa permitted him to stay in the U.S. for one month. CHS had never been to the U.S. before. Duden also helped him to obtain his passport. Duden told CHS that Pelayo funded the expenses associated with CHS's training and documentation.

When CHS first arrived, Pelayo told him he would make $600/month and that $200/month would be deducted from his salary to pay down his smuggling debt. That salary was not negotiable. At first he thought that the salary was reasonable, until he realized how hard he was expected to work. CHS worked nearly 24 hours/day. The first four months he worked for Pelayo, he did not have one day off. During the day he worked construction, and at night he cared for the elders.

CHS did not have a place to keep his clothes. Pelayo told the workers to hide their personal belongings so that if state licensing officials paid a surprise visit to the facility, they would not discover that the workers were living at the facility. Pelayo also told them that if state licensing officials ever asked the workers whether they lived at the facility, they should lie and say "no." The workers were also instructed to tell licensing officials that they worked only 8 hour days, and that Pelayo and Padolina worked the night shift.

CHS would sleep wherever he could find a place. Sometimes he slept on the floor in the same room as a male resident. He would eat the same food that was prepared for the elders. Sometimes when Isidra, who worked at the Walton House, had a day off, she would buy them food. Isidra was treated differently than the other workers because she had her green card and was not brought to the U.S. by Pelayo.

When CHS finally had his first day off, Pelayo told him not to go far and to be back at the house by dark because CHS did not have papers to be in the country legally and he might get caught by the police. He did not feel he had any choice but to follow her instructions. If he did not follow her orders, she would get mad. Pelayo constantly reminded the workers that if it was not for her, they would not be in the U.S. and therefore they had to do as they were told. Also, CHS had nowhere else to go. He did not know anyone in the U.S. and he was scared what would happen if he tried to leave.

**EXHIBIT B**
**19**

CHS Reporting
50-LA-249037 (Pending), 02/05/2009

      CHS was able to talk to his family in the Philippines. He did not tell them the truth regarding his situation. He was able to call them with phone cards that he would buy from Isidra. CHS's family in the Philippines knew Pelayo and believed she was nice. After CHS escaped, Pelayo called his family in the Philippines and told them that he left without paying his debt to her. Pelayo told his family to have CHS call her because he needed to go back to work for her. His family was worried about CHS and what might happen to him. They asked him whether he was aware of the consequences of his actions, because Pelayo had told his family that he had stolen things from her and that she had reported him to the police.

      The facility where CHS worked (the Vernon House) was next door to Pelayo's personal home. The Vernon House was only licensed for six elder residents. However, at times Pelayo had seven or eight elder residents housed at the Vernon House. During those periods, Pelayo would hide the additional elders at her personal home during the daytime, to avoid detection in case of a surprise visit by licensing officials. They would stay in a room on the ground floor. Marites would care for those patients. If she needed help lifting a patient, she would call CHS. Those patients' families knew that the elders were staying at Pelayo's personal home during the day. Onetime, one of the elders who was at Pelayo's house was dying. The paramedics were called to respond and CHS had to quickly move the dying elder from Pelayo's personal home to the facility so that the patient wasn't found at Pelayo's house.

      Pelayo had told CHS that she was helping Marites and Angela and Marivic with getting papers to live in the U.S. permanently. She told him that she would also help him with his papers if he did not leave. Pelayo said he would have to work for her for ten years. CHS was concerned because he knew that Marites and Marivic had worked for Pelayo eleven years, and they still did not have their papers.

      CHS thought about returning to the Philippines but he did not have his passport. Pelayo took it from him. She also had the fake identification card that she had CHS get with the assistance of a Mexican construction worker.

When CHS was working for Pelayo, he rarely talked to Padolina. Usually they would just exchange greetings. Sometimes they would talk about the Philippines. Onetime, on CHS's birthday, Padolina had CHS over to the house for drinks. CHS was lonely and sad that he was not celebrating his birthday with friends and family. CHS did not confide in Padolina regarding the fact that he was unhappy. Padolina knew that the facility workers were smuggled

EXHIBIT B
20

CHS Reporting
50-LA-249037 (Pending), 02/05/2009

into the U.S. by Duden and what the workers' situation was once they arrived. Padolina told CHS once that Duden was good at bringing people from the Philippines to the U.S. Padolina told CHS that whenever they needed someone brought to the U.S. they would use Duden and that Duden had brought others before. Padolina did not mention any names. CHS knew that Duden had brought over Ron Nitura and Angela Guanzon.

      Prior to the termination of the interview, Assistant United States Attorney Sandy Leal informed CHS that the government made no promises regarding any benefits that may or may not be available to CHS.

038tmw01.09♦♦

**EXHIBIT B**
**21**