# In The Matter Of:

## United States of America
## v.
## Evelyn Pelayo

---

## Rodolfo Ebrole Demafeliz, Jr. VOL I

### December 2, 2008

---



# BENHYATT
## Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **963009**
number of pages 131

*Word Index Included with this Condensed Transcript.*

**EXHIBIT E
32**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

----------------------------------------

UNITED STATES OF AMERICA,              )

        Plaintiff,              )

      Vs.                              ) No. 08-458(A)-GAF

EVELYN PELAYO, RODOLFO EBROLE      ) Volume I

DEMAFELIZ, JR., AKA "DUDEN," ROLLETA)

EBROLE RIAZON, AND DARWIN PADOLINA, )

      Defendants.              )

----------------------------------------

DEPOSITION OF RODOLFO EBROLE DEMAFELIZ, JR., at

312 North Spring Street, Tenth Floor, Los Angeles,

California, commencing at 10:52 a.m., Tuesday,

December 2, 2008 before Shawna Higgins, CSR No. 10646.

PAGES 1 - 131

Page 1

**EXHIBIT E
33**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

## Page 2

1  APPEARANCES OF COUNSEL:
2
3       FOR THE PLAINTIFF UNITED STATES OF AMERICA:
4
5          UNITED STATES ATTORNEY'S OFFICE
6          U.S. DEPARTMENT OF JUSTICE
7          BY:  SANDY N. LEAL, ASSISTANT U.S.
8          ATTORNEY
9          Ronald Reagan Building and U.S.
10         Courthouse
11         411 West Fourth Street
12         Eighth Floor
13         Santa Ana, California  92701
14         (714) 338-3531
15
16         U.S. DEPARTMENT OF JUSTICE
17         CIVIL RIGHTS DIVISION
18         BY:  KAYLA BAKSHI, TRIAL ATTORNEY
19         601 D. Street NW
20         Fifth Floor
21         Washington, DC  20004
22         (202) 514-8286
23
24
25

## Page 3

1  APPEARANCES (CONTINUED):
2
3       FOR THE DEFENDANT RODOLFO EBROLE DEMAFELIZ, JR.:
4
5          GREGORY NICOLAYSEN, ESQ.
6          16000 Ventura Boulevard
7          Suite 500
8          Encino, California  91436
9          (818) 998-2706
10
11
12      FOR THE DEFENDANTS EVELYN PELAYO AND DARWIN
13      PADOLINA:
14
15         LAW OFFICES OF PHILIP P. DELUCA
16         BY:  PHILIP P. DELUCA, ESQ.
17         5820 E. Naples Plaza
18         Belmont Shore, California  90803
19         (562) 987-1300
20
21
22
23
24
25

## Page 4

1  APPEARANCES (CONTINUED):
2
3       ALSO PRESENT:
4          MIGUEL PALOMINO - ICE SPECIAL AGENT
5          TRICIA WHITEHILL - FBI SPECIAL AGENT
6          EVEYLYN PELAYO
7          DARWIN PADOLINA
8          JOSHUA MENDOZA - INTERPRETER
9          DOUGLAS STEVENS - VIDEOGRAPHER
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1          THE VIDEOGRAPHER:  Good morning.  We're on record   10:52:04
2  at 10:52 a.m. on December 2, 2008 for the videotape        10:52:06
3  deposition of Rodolfo Ebrole Demafeliz, Jr.  We are        10:52:13
4  taping this deposition at 312 North Spring Street in       10:52:18
5  Los Angeles, California, in the action entitled United     10:52:22
6  States versus Evelyn Pelayo, et al.  Case number           10:52:26
7  CR08-458(A)GAF.                                            10:52:33
8          My name is Douglas Stevens.  I am the              10:52:37
9  video production specialist from Ben Hyatt Certified       10:52:39
10 Deposition Reporters located in Encino, California.        10:52:43
11         This is tape number one of Volume I.               10:52:47
12         Would all Counsel and all present please           10:52:49
13 identify yourselves for the record.                        10:52:52
14         MS. LEAL:  Good morning.  Sandy Leal on behalf     10:52:53
15 of the United States.                                      10:52:57
16         MS. BAKSHI:  Good morning.  Kayla Bakshi on        10:52:58
17 behalf of the United States.                               10:53:01
18         MR. PALOMINO:  Miguel Palomino, ICE.               10:53:04
19         MS. WHITEHILL:  Tricia Whitehill with the FBI.     10:53:07
20         MR. DELUCA:  Good morning.  Philip Deluca          10:53:14
21 representing defendants Darwin Padolina, who is seated     10:53:16
22 to my left, and Evelyn Pelayo who is seated to my          10:53:19
23 right.                                                     10:53:23
24         I have an objection to these proceedings,          10:53:24
25 actually layers of objections that I'd like to make,       10:53:25

2  (Pages 2 to 5)

**EXHIBIT E
34**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 6

1  but I'll wait until we begin.                    10:53:28
2          MR. NICOLAYSEN: I'm Greg Nicolaysen, Counsel   10:53:31
3  for the witness who is Rodolfo Demafeliz.         10:53:33
4          THE WITNESS: Rodolfo Demafeliz.            10:53:40
5          THE VIDEOGRAPHER: Now the court reporter will   10:53:44
6  swear in the witness and interpreter.
7
8          JOSHUA MENDOZA,
9  having been duly sworn to accurately translate English
10  into Tagalog and Tagalog into English as follows:
11
12          RODOLFO EBROLE DEMAFELIZ, JR.,
13  having been first duly sworn, testified as follows:
14                              10:54:18
15          MS. LEAL: Before we begin, Mr. Deluca, is there   10:54:18
16  any objection to the interpreter Mr. Mendoza?     10:54:20
17          MR. DELUCA: Is the interpreter court certified?   10:54:25
18          THE INTERPRETER: Yes, sir.
19          MR. DELUCA: Is the interpreter state certified?   10:54:37
20          THE INTERPRETER: Not for the state.       10:54:37
21          MR. DELUCA: I have an objection that he's not   10:54:39
22  state certified. He's court certified, but not state   10:54:41
23  certified. I would say that for proceedings of this   10:54:46
24  nature that we should have an interpreter who is both   10:54:48
25  state and court certified. Moreover, Mr. Demafeliz has   10:54:51

Page 7

1  previously answered questions posed to him in English   10:54:55
2  throughout these proceedings so I'm a little befuddled   10:55:00
3  as to why he's using an interpreter for these       10:55:03
4  proceedings. So that's -- so I have two objections.   10:55:05
5          MR. NICOLAYSEN: I'll speak to that. I'm going   10:55:09
6  to respond to that. Would you like to have the camera   10:55:12
7  on me for that or shall I just speak into the       10:55:15
8  microphone? All right.                           10:55:17
9          I'm counsel for the witness, Rodolfo Demafeliz.   10:55:19
10  Mr. Demafeliz does speak English and does understand   10:55:22
11  English, however, for purposes of the formalities of a   10:55:25
12  legal proceeding of this nature, it is my decision and   10:55:29
13  with concurrence of Government Counsel that a federally   10:55:33
14  certified court interpreter in the Tagalog language   10:55:36
15  should be used. And my client concurs with that. If   10:55:41
16  Government Counsel and Mr. Deluca does not object, I   10:55:45
17  would just like to have my client state on the record   10:55:48
18  that it is in fact his preference to proceed today with   10:55:51
19  the assistance of a Tagalog interpreter.           10:55:52
20          THE WITNESS: Yes, I would.                 10:56:05
21          MR. DELUCA: My objections remain for the   10:56:08
22  record. I also have other objections which I wish to   10:56:11
23  lodge at this time. I am objecting to these        10:56:13
24  proceedings even going forward today for various   10:56:16
25  reasons. Number one, I made an agreement to not oppose   10:56:19

Page 8

1  these proceedings under Rule 15 if I received all   10:56:22
2  related discovery no later than November 3, 2008.   10:56:26
3  November 3rd came and went. I received on November 7th   10:56:33
4  a cover letter dated November 4th with Bates stamped   10:56:37
5  pages 7865 through 7876. Thereafter I received even   10:56:42
6  more discovery on November 26th faxed to me in mid   10:56:49
7  afternoon. I received about 25 pages of discovery   10:56:56
8  Bates stamped -- actually 22 pages, Bates stamped page   10:57:00
9  12000 through 12023. Thereafter I received           10:57:06
10  notification by e-mail yesterday in the evening that my   10:57:13
11  office was faxed documents totaling approximately 20   10:57:18
12  pages consisting of Mr. Demafeliz's plea agreement.   10:57:22
13  However, that fax I learned today was not received in   10:57:25
14  my office until 7:16 p.m. I did receive the documents   10:57:29
15  via e-mail from Ms. Bakshi at about 8:40 p.m. last   10:57:33
16  night.                                           10:57:38
17          The prejudice that's involved here is I   10:57:39
18  specifically agreed to have this Rule 15 deposition if   10:57:41
19  I received all discovery by November 3rd. As       10:57:45
20  indicated, I didn't receive any discovery on         10:57:47
21  November 3rd or prior to that related to these      10:57:52
22  proceedings. Everything came later which includes the   10:57:55
23  proffered sessions that were done between Mr. Demafeliz   10:57:58
24  and Counsel or the -- by the investigators. And one is   10:58:04
25  dated September 23rd, transcription pages 7875 through   10:58:11

Page 9

1  7868. Another from an interview that was done with   10:58:20
2  Mr. Demafeliz on October 1, 2008. Another of an     10:58:22
3  interview with Mr. Demafeliz on October 8, 2008, which   10:58:27
4  is Bates stamped pages 7873 through 7875. I neglected   10:58:33
5  to mention the other was Bates stamped pages 7869   10:58:38
6  through 7872. The prejudice is it gives me little or   10:58:43
7  no time to attempt to investigate matters that are   10:58:48
8  contained within these proffered statements. Moreover,   10:58:52
9  having received only on November 26th, the day before   10:58:56
10  Thanksgiving, the other 23 pages of materials         10:59:00
11  consisting of various documents pertaining to people   10:59:05
12  that allegedly were brought over to the United States   10:59:09
13  by Mr. Demafeliz, I haven't had any opportunity       10:59:11
14  whatsoever to investigate matters contained within   10:59:14
15  those documents. As, for example, a contact name,   10:59:19
16  Master Stan Witz, W-i-t-z, not given any time to     10:59:21
17  attempt to contact this individual or any other       10:59:26
18  individuals that are mentioned throughout these       10:59:28
19  documents in an attempt to investigate and be        10:59:30
20  adequately prepared for a Rule 15 deposition which is   10:59:34
21  analogous to trial testimony.                     10:59:38
22          I feel both of my clients, to wit           10:59:40
23  Mr. Padolina, and to my right, Ms. Pelayo, are gravely   10:59:43
24  prejudiced by not being able to do that.           10:59:47
25          Moreover, I was told that the reason why we need   10:59:50

3  (Pages 6 to 9)

**EXHIBIT E**
**35**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

## Page 10

1  to have this Rule 15 deposition is because  10:59:53
2  Mr. Demafeliz is going to be released back to the  10:59:56
3  Philippines and will not be present to testify at the  11:00:00
4  trial. If I read the plea agreement correctly, it says  11:00:04
5  that he's being released on a bond and has to remain in  11:00:06
6  the United States and cannot apply for a passport or  11:00:10
7  visa pending the out -- the trial of this matter. So  11:00:13
8  that, too, is contrary to what I was told prior to  11:00:18
9  today, which induced me to agree to these proceedings.  11:00:22
10      On the basis of the foregoing objections I'm  11:00:25
11  objecting to this proceeding going forward as I feel I  11:00:28
12  have been sandbagged by the United States Attorney's  11:00:32
13  Office.  11:00:36
14      MS. LEAL: The government is going to respond to  11:01:53
15  a limited extent because a response is not necessary at  11:01:55
16  this time and will be addressed again before the Court  11:01:57
17  at trial. But the government would note that defense  11:02:01
18  objections related to the defendants' defense assertion  11:02:06
19  that Mr. Demafeliz is not being -- is not going to be  11:02:11
20  deported or removed from this country at any time, at  11:02:17
21  any time before trial is incorrect. If the -- I would  11:02:22
22  refer Defense Counsel to the bond order issued by the  11:02:27
23  Court in this matter which was signed on November 26,  11:02:31
24  2008 which indicates that deportation is a condition of  11:02:35
25  bond, deportation or voluntary removal from this  11:02:38

## Page 11

1  country.  11:02:42
2      I would also note that this matter was initially  11:02:43
3  ordered to -- this deposition was initially ordered by  11:02:48
4  the Court to occur on November 26, 2008. Prior to that  11:02:51
5  Defense Counsel indicated that he was not prepared to  11:02:58
6  go forward at that date and requested additional time.  11:03:01
7  The parties agreed to move the Rule 15 deposition from  11:03:05
8  November 26th to today's date, December 2, 2008.  11:03:10
9  Because the deposition was moved to today's date,  11:03:16
10  Mr. Demafeliz's sentencing was moved from December 1,  11:03:20
11  2008 to December 8 2008, so Mr. Demafeliz has not been  11:03:25
12  sentenced in this matter.  11:03:29
13      MR. NICOLAYSEN: Let me also state on the record  11:03:34
14  as Counsel for the witness that it is my expectation  11:03:36
15  and understanding pursuant to the stipulation for bond  11:03:38
16  that my client will in fact be deported. My  11:03:42
17  anticipation is that it will be a voluntarily  11:03:45
18  deportation, which is the reason we have coordinated  11:03:48
19  his release on bond. However, to the extent that  11:03:51
20  voluntarily deportation ultimately is not possible, my  11:03:54
21  client is required pursuant to the bond stipulation as  11:03:57
22  well as our professional understandings that he will  11:04:01
23  submit to the immigration authority for purposes of  11:04:04
24  being deported by the U.S. Government and, therefore,  11:04:08
25  either by voluntarily or by Government coordinated  11:04:11

## Page 12

1  deportation my client will not be physically in the  11:04:15
2  country at the time of the trial of Ms. Pelayo and the  11:04:18
3  defendants.  11:04:22
4      MS. LEAL: The Government will also note that  11:04:23
5  the plea agreement that was provided to Defense Counsel  11:04:25
6  yesterday in discovery for Mr. Demafeliz was filed --  11:04:28
7  was originally filed in this case not under seal, but  11:04:32
8  Mr. Demafeliz's counsel orally moved to have it placed  11:04:37
9  under seal. The Government filed a motion to unseal  11:04:40
10  that document and it was signed yesterday after the  11:04:43
11  Government received a call from the court clerk at  11:04:47
12  approximately 4:45 p.m., that the order had been signed  11:04:51
13  and it could be released in discovery.  11:04:56
14      MR. DELUCA: Again, I would reiterate there is  11:05:03
15  multiple prejudices to both of my clients by virtue of  11:05:04
16  my not receiving all of the discovery that I outlined  11:05:08
17  in my objections sooner. We are greatly prejudiced by  11:05:11
18  Mr. Demafeliz being admitted to be released out of the  11:05:16
19  country. And I maintain all of my objections and I  11:05:20
20  will reassert them at some time between now and our  11:05:25
21  trial date.  11:05:28
22      MS. LEAL: May I proceed?  11:05:33
23      MR. DELUCA: Yes.  11:05:35
24  ///
25  ///

## Page 13

1      EXAMINATION  11:05:35
2  11:05:35
3  BY MS. LEAL:
4      Q.  Would you please state your name for the  11:05:38
5  record.  11:05:40
6      A.  Rodolfo Demafeliz, Jr.  11:05:41
7      Q.  Mr. Demafeliz, what country were you born  11:05:48
8  in?  11:05:51
9      A.  Philippines.  11:05:51
10      Q.  And what country are you a citizen of?  11:05:58
11      A.  Philippines.  11:06:01
12      Q.  And what is your native language?  11:06:05
13      A.  Tagalog.  11:06:08
14      Q.  Before you came to the United States most  11:06:14
15  recently, what city and country did you live in?  11:06:18
16      A.  Makati City.  11:06:22
17      Q.  In what country?  11:06:32
18      A.  Philippines.  11:06:34
19      Q.  And what did you do for a living in the  11:06:35
20  Philippines?  11:06:41
21      A.  I was teaching Taekwondo as an  11:06:44
22  instructor.  11:06:55
23      Q.  Did you teach in any particular place?  11:06:56
24      A.  Three places, but the main one was at  11:07:00
25  Colallio St. Augustine.  11:07:11

4 (Pages 10 to 13)

**EXHIBIT E
36**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 14

```
1    Q.   And how long have you worked as an      11:07:14
2  instructor? Approximately how many years?      11:07:18
3    A.   It has been 20 years.           11:07:20
4    Q.   And could you tell us what qualifications   11:07:28
5  do you have to instruct in Taekwondo?           11:07:31
6    A.   You need to be a qualified as a black    11:07:34
7  belt and also you have been licensed by the Taekwondo   11:07:57
8  Association of the Philippines as an instructor and as   11:08:02
9  a referee. And I am a six Dan black belt.        11:08:05
10   Q.   Have you been licensed as an instructor   11:08:12
11 and referree?                       11:08:15
12   A.   Yes.                      11:08:20
13   Q.   Have you ever won any competitions in    11:08:23
14 Taekwondo?                         11:08:27
15   A.   Many times, local and international.     11:08:35
16   Q.   You stated earlier that you teach as a   11:08:38
17 Taekwondo instructor as St. Augustine. Can you please  11:08:46
18 explain your role as an instructor at St. Augustine?   11:08:55
19   A.   There are two roles that I do. I teach  11:09:08
20 P.E., or physical education, and then after dismissal  11:09:31
21 then I teach in the extracurricular activities. But   11:09:36
22 all of them are Taekwondo.               11:09:43
23   Q.   Okay. And approximately how many       11:09:45
24 students are enrolled in your program?           11:09:47
25   A.   All in all about 300.            11:09:50
```

Page 15

```
1    Q.   Do you have any assistants?         11:09:59
2    A.   I have five or six assistants. It is   11:10:02
3  necessary if one has a lot of students.         11:10:14
4    Q.   Okay. And have you ever traveled for    11:10:18
5  Taekwondo competitions internationally?          11:10:21
6    A.   Yes, many times.               11:10:23
7    Q.   And when you travel do you travel alone  11:10:30
8  with your team or both?                  11:10:34
9    MR. DELUCA: The question assumes that there's  11:10:39
10 some level of regularity.                11:10:41
11 BY MS. LEAL:                        11:10:51
12   Q.   I'm going to rephrase the question.    11:10:53
13       You said you have traveled to Taekwondo  11:10:55
14 competitions. Do you --                 11:10:58
15   A.   Yes.                      11:11:04
16   Q.   Do you travel alone all the time?      11:11:04
17   A.   There were times when I travel alone, but 11:11:07
18 most of the time I take along a team with me.      11:11:22
19   Q.   And approximately how many team members  11:11:25
20 do you take?                        11:11:28
21   A.   When I travel the minimum is five, but  11:11:30
22 sometimes it would get up to 12.              11:11:48
23   Q.   Okay. Now, what's the purpose of       11:11:51
24 participating in these tournaments?             11:11:54
25   A.   Number one is so that I can expose and  11:11:56
```

Page 16

```
1  promote my gym and expose my students. And then also I  11:12:12
2  can give honor and recognition for my country.      11:12:23
3    Q.   What countries have you traveled to to   11:12:26
4  attend tournaments?                    11:12:34
5    A.   The first one that I went to like -- but 11:12:36
6  then it's different countries. The number one is    11:12:53
7  Korea. We went also to Thailand and Hong Kong and    11:12:58
8  then, of course, here in the United States.       11:13:10
9    Q.   You said the first time you took your   11:13:13
10 team outside the Philippines was to Korea; is that   11:13:15
11 correct?                          11:13:22
12   A.   Correct. That was in 1998.          11:13:22
13   Q.   Did you travel to the United States for  11:13:28
14 tournaments after 1998?                  11:13:31
15   A.   I started coming here in the year 2000   11:13:33
16 when I participated in the U.S. Open, but I was not   11:13:54
17 with the team, I was by myself.              11:14:01
18   Q.   I want to direct your attention to on or 11:14:04
19 about March 26, 2008. Did you travel to the United   11:14:12
20 States for a Taekwondo tournament?             11:14:15
21   A.   Yes.                      11:14:17
22   Q.   And on April 3, 2008 you were arrested  11:14:28
23 for alien smuggling; is that correct?           11:14:33
24   A.   Yes.                      11:14:39
25   Q.   Since then you have in fact pled guilty  11:14:46
```

Page 17

```
1  to conspiring to transport illegal aliens into the   11:14:50
2  United States; is that correct?             11:14:55
3    A.   Correct.                    11:14:56
4    Q.   Did you plead guilty pursuant to a plea  11:15:05
5  agreement?                         11:15:10
6    A.   Yes.                      11:15:16
7    Q.   Special Agent Palomino is going to place 11:15:28
8  a document in front of you what has been marked for   11:15:35
9  identification purposes as Government's Exhibit 1.    11:15:38
10       (The document referred to was marked as  11:15:41
11 Exhibit 1 for identification.)
12 BY MS. LEAL:                        11:15:44
13   Q.   I would ask the court interpreter if he  11:15:46
14 could turn it to page 17 of that document.        11:15:48
15       Do you recognize this, Mr. Demafeliz?   11:15:54
16   MR. DELUCA: The question is vague. Does he    11:16:13
17 recognize page 17 or the entire document, or something 11:16:16
18 on page 17?                         11:16:18
19   MS. LEAL: I'll rephrase that question.       11:16:19
20 BY MS. LEAL:                        11:16:21
21   Q.   Mr. Demafeliz, do you recognize your    11:16:22
22 signature on page 17?                   11:16:24
23   A.   Yes.                      11:16:25
24   Q.   And do you -- next to your signature    11:16:32
25 there is a date. It says September 24, 2008. Is that  11:16:40
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**EXHIBIT E**
**37**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

## Page 18

1  the date you signed that document?        11:16:43
2      A.   Yes.                              11:16:45
3      Q.   And, Mr. Demafeliz -- actually,   11:16:53
4  Mr. Interpreter, could you please turn to the first  11:17:23
5  page of that document.                     11:17:25
6      Mr. Demafeliz, do you recognize this  11:17:31
7  document?                                  11:17:33
8      A.   Yes.                              11:17:33
9      Q.   What do you recognize it to be?   11:17:38
10     A.   This is the document that was given to me  11:17:40
11 by my lawyer as a plea agreement that I need to sign,  11:17:55
12 and in that that I am pleading and admitting guilt.  11:18:09
13     Q.   And before you signed this document,  11:18:15
14 Mr. Demafeliz, was it translated to you in the Tagalog  11:18:19
15 language?                                  11:18:29
16     A.   Yes.                              11:18:30
17     Q.   Did you go over this document with your  11:18:31
18 attorney?                                  11:18:33
19     A.   Yes.                              11:18:33
20     Q.   What is your understanding of your duties  11:18:39
21 under your plea agreement?                 11:18:43
22     MR. DELUCA: I would object the question is  11:18:46
23 compound. It's 17 pages. Compound.        11:18:48
24 BY MS. LEAL:                              11:18:56
25     Q.   Again, Mr. Demafeliz, what is your  11:18:57

## Page 19

1  understanding of your duties under your plea agreement?  11:18:59
2      MR. DELUCA: Same objections.          11:19:02
3      THE WITNESS: What I understand is that I need  11:19:05
4  to tell the truth and tell what happened. And I have  11:19:15
5  to admit that I had a hardship, I had a hard time, but  11:19:40
6  it is better to tell what is the truth.    11:19:43
7  BY MS. LEAL:                              11:19:47
8      Q.   And what is your understanding of the  11:19:48
9  Government's obligations to you in this plea agreement?  11:19:50
10     A.   When I tell the truth I'll be able to go  11:19:53
11 home early.                                11:20:07
12     Q.   Mr. Demafeliz, Special Agent Palomino  11:20:11
13 is --                                     11:20:21
14     THE INTERPRETER: Just a minute. He's asking me  11:20:25
15 to adjust it.                             11:20:36
16 BY MS. LEAL:                              11:20:38
17     Q.   Mr. Demafeliz, can you hear okay?  11:20:38
18     A.   Yes.                              11:20:41
19     Q.   Please let us know if you have any  11:20:44
20 problems with the headphones.              11:20:47
21     THE INTERPRETER: He said he could not hear.  11:21:05
22     MR. NICOLAYSEN: Can we have a stipulation to go  11:21:08
23 off the record?                           11:21:10
24     MS. LEAL: Would the parties agree to go off the  11:21:11
25 record to adjust the headphones?           11:21:13

## Page 20

1      MR. DELUCA: Yes.                      11:21:15
2      THE VIDEOGRAPHER: We are off the record at  11:21:16
3  11:21 a.m.                                11:21:19
4      (Off the record.)                     11:21:21
5      THE VIDEOGRAPHER: We are back on record at  11:22:33
6  11:23 a.m.                                11:23:19
7      MS. LEAL: For the record, the parties  11:23:21
8  stipulated to go off the record in order to allow the  11:23:23
9  interpreter to change the batteries in the headphones  11:23:26
10 that Mr. Demafeliz is using and to make sure that he  11:23:30
11 could hear through the headphones.         11:23:34
12 BY MS. LEAL:                              11:23:37
13     Q.   Mr. Demafeliz, can you hear at this  11:23:37
14 moment?                                    11:23:39
15     A.   Yes.                              11:23:39
16     Q.   Please let us know if you have any  11:23:42
17 problems with the headphones.              11:23:44
18     A.   No more.                          11:23:45
19     Q.   Special Agent Palomino placed before you  11:23:49
20 what has been marked for identification purposes as  11:23:53
21 Exhibit 2.                                11:23:57
22     (The document referred to was marked as  11:23:58
23 Exhibit 2 for identification.)             11:23:59
24 BY MS. LEAL:                              11:23:59
25     Q.   Do you recognize the person in this  11:23:59

## Page 21

1  picture?                                  11:24:01
2      A.   Yes.                              11:24:02
3      Q.   Who do you recognize this person to be?  11:24:08
4      A.   Ferdinand Espiritu.               11:24:11
5      Q.   How do you know Ferdinand Espiritu?  11:24:20
6      A.   Since the first one that Evelyn or Ate  11:24:24
7  Evelyn called me about to be able to help him.  11:24:40
8      Q.   Is Ferdinand Espiritu a male or female?  11:24:43
9      A.   Male.                             11:24:52
10     Q.   Okay. You said that -- you said that  11:24:57
11 Evelyn contacted you regarding Ferdinand Espiritu; is  11:25:09
12 that correct?                             11:25:13
13     MR. DELUCA: The question is vague as to time.  11:25:20
14     THE WITNESS: Yes.                      11:25:23
15 BY MS. LEAL:                              11:25:24
16     Q.   Are you acquainted with Evelyn Pelayo?  11:25:24
17     MR. DELUCA: The question is vague as to time.  11:25:28
18     THE WITNESS: Before I did not know her, but  11:25:31
19 then after she called me, that was when we first met  11:25:46
20 regarding Ferdie.                         11:25:50
21 BY MS. LEAL:                              11:25:52
22     Q.   Do you know a person by the name Evelyn  11:25:53
23 Pelayo?                                   11:25:55
24     A.   Yes.                              11:25:56
25     Q.   Do you see her in the room today?  11:26:01

6 (Pages 18 to 21)

**EXHIBIT E**
**38**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 22

```
 1      A.   Yes.                              11:26:04
 2      Q.   Could you please describe what she is    11:26:08
 3   wearing or point in the direction that she is sitting?   11:26:12
 4      A.   That's her.                        11:26:15
 5      Q.   Let the record reflect that --        11:26:23
 6      MR. DELUCA:  I would object to the camera moving   11:26:29
 7   to Evelyn.  If he wants to describe -- he was asked to   11:26:31
 8   describe what clothing she was wearing and he responded   11:26:34
 9   by pointing to her.  I'm objecting to the camera moving   11:26:37
10   onto Ms. Pelayo just simply because he pointed to her.   11:26:41
11      MS. LEAL:  Do you stipulate to the fact    11:26:45
12   Mr. Demafeliz just identified Ms. Pelayo?    11:26:46
13      MR. DELUCA:  That he pointed to Mrs. Pelayo,    11:26:50
14   yes.                                       11:26:52
15      MS. LEAL:  Let the record reflect that     11:26:52
16   Mr. Demafeliz pointed to Ms. Pelayo in the room today.   11:26:54
17      THE WITNESS:  Because I'm -- I don't really know   11:26:58
18   very well what kind of dress or what kind of clothes   11:27:04
19   she's wearing.                             11:27:08
20   BY MS. LEAL:                               11:27:08
21      Q.   Okay.  Mr. Demafeliz, do you know a    11:27:09
22   person by the name of Darwin Padolina?       11:27:12
23      MR. DELUCA:  The question is vague.       11:27:19
24      THE WITNESS:  Yes.                       11:27:20
25   ///                                        11:27:21
```

Page 23

```
 1   BY MS. LEAL:
 2      Q.   And do you see Mr. Padolina in the room   11:27:22
 3   today?                                     11:27:25
 4      A.   Yes.  He is wearing brown and it is a   11:27:27
 5   Polo and he is with eyeglasses.            11:27:39
 6      MS. LEAL:  Mr. Deluca, do you agree that   11:27:47
 7   Mr. Demafeliz has identified Mr. Padolina?   11:27:49
 8      MR. DELUCA:  Yes.                        11:27:52
 9      MS. LEAL:  Let the record reflect that     11:27:53
10   Mr. Demafeliz has identified Mr. Padolina in the room   11:27:54
11   today.                                     11:27:58
12   BY MS. LEAL:                               11:27:59
13      Q.   Mr. Demafeliz, you said that the -- you   11:28:00
14   were contacted by Evelyn Pelayo in regards to Ferdinand   11:28:04
15   Espiritu; is that correct?                  11:28:20
16      A.   Yes.                               11:28:11
17      Q.   How were you contacted by Ms. Pelayo?   11:28:20
18      A.   What I know, I was in the Philippines and   11:28:25
19   she was here and asked me whether I can help take along   11:28:49
20   Ferdie here into the United States.         11:28:54
21      MR. DELUCA:  Move to strike as nonresponsive.   11:28:57
22      THE WITNESS:  Will you repeat, please.     11:29:04
23   BY MS. LEAL:                               11:29:06
24      Q.   Mr. Demafeliz, how were you contacted by   11:29:06
25   Evelyn Pelayo?                             11:29:11
```

Page 24

```
 1      MR. DELUCA:  Lacks foundation.           11:29:19
 2      THE WITNESS:  By telephone.              11:29:20
 3   BY MS. LEAL:                               11:29:22
 4      Q.   Okay.  When Evelyn -- when you were    11:29:23
 5   contacted by telephone by Ms. Pelayo can you tell me   11:29:28
 6   about that conversation?                   11:29:32
 7      MR. DELUCA:  The question calls for hearsay.   11:29:41
 8      THE WITNESS:  (No response.)             11:29:46
 9   BY MS. LEAL:                               11:30:00
10      Q.   Go ahead and proceed, please.        11:30:00
11      A.   She contacted me and then I was asking   11:30:32
12   whether it is possible to help her and that if I may be   11:30:36
13   able to help her take along Ferdie with me.  I said I   11:30:42
14   am going to do everything I can do, but I'm not   11:30:55
15   promising.  But I said I'll do everything because I   11:30:58
16   believe that my team will be helped after I get paid.   11:31:13
17      THE REPORTER:  Held or helped?
18      THE INTERPRETER:  After I got paid.
19      MS. LEAL:  Did he say "helped" or "held"?    11:31:27
20      MR. NICOLAYSEN:  He will be helped.       11:31:27
21      MS. LEAL:  I'm asking the interpreter to please   11:31:33
22   again state what Mr. Demafeliz said.        11:31:35
23      THE INTERPRETER:  He said paid, after I got paid   11:31:39
24   my team will be helped.                    11:32:05
25   ///                                        11:32:08
```

Page 25

```
 1   BY MS. LEAL:
 2      Q.   Mr. Demafeliz, can you please tell us   11:32:09
 3   again?                                     11:32:10
 4      A.   We spoke to each other that I will do my   11:32:15
 5   best to take him, then after I take him with me then I   11:32:23
 6   will be getting payment for taking him here so that I   11:32:34
 7   can help my team.                          11:32:41
 8      Q.   Okay.                              11:32:42
 9      MR. DELUCA:  Move to strike as nonresponsive and   11:32:44
10   also hearsay.                              11:32:49
11   BY MS. LEAL:                               11:32:50
12      Q.   That does not a require a response from   11:32:50
13   you, Mr. Demafeliz.                        11:32:53
14           When you say to help Ferdie to bring him   11:32:54
15   here, where are you referring to?          11:33:00
16      MR. DELUCA:  Misstates his testimony.      11:33:15
17      THE WITNESS:  That I need to help her for   11:33:17
18   somebody to work at her facility.          11:33:28
19   BY MS. LEAL:                               11:33:31
20      Q.   When you say "her," who are you referring   11:33:31
21   to?                                        11:33:33
22      MR. DELUCA:  Hearsay.                    11:33:41
23      THE WITNESS:  Ate Evelyn.               11:33:42
24      MR. DELUCA:  Objection.  Hearsay.         11:33:44
25   ///                                        11:33:52
```

7 (Pages 22 to 25)

**EXHIBIT E**
**39**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 26

1  BY MS. LEAL:
2     Q.   After, after that telephone discussion      11:34:09
3  with Evelyn Pelayo, what did you do, if anything?      11:34:13
4     MR. DELUCA:   The question is vague as to time.      11:34:25
5     THE WITNESS:   I trained him well and then we      11:34:33
6  went to Thailand to be able to get the certificate.      11:34:43
7  BY MS. LEAL:      11:34:47
8     Q.   When you say you "trained him well," who      11:34:47
9  are you referring to?      11:34:50
10    A.   Ferdinand Espiritu.      11:34:50
11    Q.   What did you train Ferdinand Espiritu in?      11:34:59
12    A.   I trained him and then I took him with me      11:35:02
13  to Thailand so that he will have on record that he      11:35:28
14  trained and also that he's been issued a certificate.      11:35:32
15    MR. DELUCA:   Move to strike as nonresponsive.      11:35:37
16  BY MS. LEAL:      11:35:40
17    Q.   When you say you trained Ferdinand      11:35:42
18  Espiritu what did you train him in?      11:35:46
19    A.   Practice of Taekwondo, so that he may      11:35:57
20  become a player so that he will be able to join.      11:36:08
21    Q.   To join what?      11:36:12
22    A.   Be able to join my team in preparation      11:36:14
23  for getting a U.S. visa.      11:36:24
24    Q.   And what was the purpose in Ferdinand      11:36:26
25  Espiritu getting a U.S. visa as a team member of your      11:36:30

Page 27

1  team?      11:36:35
2     MR. DELUCA:   Calls for speculation.      11:36:45
3     THE WITNESS:   I train him so that he will be      11:36:47
4  able to join the team and then after he has joined the      11:37:22
5  team then he will become a player and be able to join      11:37:27
6  the team and then he may be able to pass the -- and be      11:37:31
7  able to get the visa.      11:37:38
8     MR. DELUCA:   Move to strike as nonresponsive.      11:37:41
9  BY MS. LEAL:      11:37:44
10    Q.   What was the purpose in Ferdinand      11:37:45
11  Espiritu being able to get a visa?      11:37:48
12    MR. DELUCA:   The question is vague.      11:37:56
13    THE WITNESS:   That what he is going to tell the      11:37:57
14  consul is that he will participate and he will be      11:38:09
15  joining and participate in competition.      11:38:12
16  BY MS. LEAL:      11:38:15
17    Q.   If you know, is that the true purpose for      11:38:16
18  coming to the United States?      11:38:18
19    MR. DELUCA:   Calls for speculation.      11:38:22
20    THE WITNESS:   No.      11:38:24
21    MR. DELUCA:   Move to strike as speculative.      11:38:26
22  BY MS. LEAL:      11:38:28
23    Q.   What is the true purpose for Ferdinand      11:38:28
24  Espiritu to come to the United States?      11:38:30
25    MR. DELUCA:   Hearsay and calls for speculation.      11:38:39

Page 28

1     THE WITNESS:   The main reason is for her -- for      11:38:56
2  him to be able to work at the facility of Evelyn.      11:38:59
3     MR. DELUCA:   Move to strike as speculation.      11:39:05
4  Hearsay.      11:39:07
5  BY MS. LEAL:      11:39:07
6     Q.   Did you assist Ferdinand Espiritu in      11:39:08
7  getting a visa to travel to the United States as a team      11:39:10
8  member?      11:39:16
9     A.   Yes.      11:39:28
10    Q.   Can you please tell me how you assisted      11:39:28
11  him?      11:39:32
12    A.   I train him, then he join the team in      11:39:32
13  going to the embassy, and then all of them passed.      11:39:53
14    Q.   Was Ferdinand Espiritu issued a visa to      11:39:57
15  travel to the United States -- let me finish the      11:40:09
16  question.      11:40:12
17       Was Ferdinand Espiritu issued a visa to      11:40:12
18  travel to the United States and compete in a Taekwondo      11:40:16
19  tournament?      11:40:20
20    MR. DELUCA:   Compound.   Calls for speculation.      11:40:20
21  BY MS. LEAL:      11:40:31
22    Q.   If you know.      11:40:32
23    MR. DELUCA:   Same objections.   Compound.   Calls      11:40:32
24  for speculation.      11:40:34
25    THE WITNESS:   Yes.      11:40:34

Page 29

1  BY MS. LEAL:      11:40:35
2     Q.   Do you know if Ferdinand Espiritu      11:40:40
3  traveled to the United States on that visa?      11:40:42
4     A.   Yes, he came with me.      11:40:53
5     Q.   And when you and Ferdinand traveled to      11:40:55
6  the United States where did you travel to, what city?      11:40:59
7     A.   We arrive at LAX.      11:41:02
8     Q.   By "LAX" are you referring to Los Angeles      11:41:16
9  International Airport?      11:41:19
10    A.   Correct.      11:41:20
11    Q.   After you entered the United States with      11:41:28
12  Ferdinand Espiritu what did you do next?      11:41:31
13    MR. DELUCA:   The question is vague, leading.      11:41:37
14    THE WITNESS:   We just stopped briefly at my      11:41:42
15  older sister's place, then called Ate Evelyn so that we      11:42:00
16  can meet and then give Ferdinand.      11:42:04
17  BY MS. LEAL:      11:42:09
18    Q.   You referred to Evelyn Pelayo as Ate      11:42:10
19  Evelyn.   Can you tell me what you mean by Ate?      11:42:14
20    A.   Like an older sister as a form of      11:42:17
21  respect.      11:42:34
22    Q.   You said that after you entered the      11:42:35
23  United States you went to your sister's house and then      11:42:40
24  you contacted Evelyn.   How did you contact Evelyn?      11:42:42
25    A.   I'm not so sure whether it was me or      11:42:54

8 (Pages 26 to 29)

**EXHIBIT E**
**40**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 30

```
 1    Ferdie who contacted her, but she knew that we were    11:43:09
 2    coming.                                                11:43:13
 3         MR. DELUCA: Move to strike. Hearsay.              11:43:15
 4    Speculation.                                           11:43:17
 5    BY MS. LEAL:                                           11:43:18
 6         Q.   What happened after you contacted -- what    11:43:19
 7    happened after Evelyn was contacted, if anything?      11:43:23
 8         A.   We met at the certain place, I don't         11:43:29
 9    remember where, and then she came and pick up Ferdie.  11:43:35
10         Q.   When you say you met at a place, what        11:43:42
11    kind of place?                                         11:43:49
12         A.   Actually I don't really remember because     11:43:50
13    it has been a long time.                               11:44:05
14         Q.   Okay. So when you met, tell me exactly       11:44:09
15    what happened?                                         11:44:14
16         MR. DELUCA: Calls for speculation. Lacks          11:44:22
17    foundation.                                            11:44:25
18         THE WITNESS: What I remember that happened        11:44:30
19    after we met, after she pick up Ferdie, I got paid for 11:44:32
20    Ferdie about 6,000 U.S. dollars.                       11:44:48
21    BY MS. LEAL:                                           11:44:55
22         Q.   So when you met, you said that you,          11:44:56
23    Ferdie -- you -- Ferdie went with Evelyn -- strike     11:44:59
24    that.                                                  11:45:05
25         MR. DELUCA: Misstates his testimony.              11:45:05
```

Page 31

```
 1    BY MS. LEAL:                                           11:45:06
 2         Q.   Strike that.                                 11:45:07
 3              You said you were paid $6,000. Can you       11:45:07
 4    tell me in what form you were paid this money?         11:45:10
 5         MR. DELUCA: The question is vague. Lacks          11:45:17
 6    foundation. Yeah, lacks foundation.                    11:45:20
 7         THE WITNESS: Cash, $100 bills.                    11:45:24
 8    BY MS. LEAL:                                           11:45:26
 9         Q.   And who paid you?                            11:45:27
10         A.   Ate Evelyn.                                  11:45:28
11         Q.   Was anyone else present when you were        11:45:32
12    paid?                                                  11:45:35
13         A.   For what I know, it was in secret. I         11:45:35
14    know that Ferdie did not see us.                       11:45:49
15         Q.   Was anyone else present?                     11:45:52
16         MR. DELUCA: Move to strike as speculation.        11:45:54
17         MS. LEAL: For the record, I would ask,            11:46:01
18    Mr. Deluca, when you make your objections if you could 11:46:03
19    not overpower the interpretation that is being made at 11:46:05
20    that time so the record can be clear.                  11:46:09
21         MR. DELUCA: Well, she's not interpreting.         11:46:11
22    She's not taking down what the interpreter is saying.  11:46:12
23    She's taking down only the English word so the --      11:46:14
24         MS. LEAL: I cannot hear the interpretation        11:46:17
25    because you're talking over the interpreter.           11:46:19
```

Page 32

```
 1         MR. DELUCA: Could you say that again?             11:46:20
 2         MS. LEAL: I cannot hear the interpretation into   11:46:22
 3    English because you're saying the objection while he is 11:46:25
 4    still translating what Mr. Demafeliz is saying. So     11:46:28
 5    just to make the record clear, if -- I'm not asking -- 11:46:32
 6    I'm not saying you cannot object, but if you can make  11:46:35
 7    sure that everyone is heard.                           11:46:37
 8         MR. NICOLAYSEN: Let me make this suggestion if    11:46:39
 9    I may. Mr. Deluca obviously has a right to object, so  11:46:41
10    I would propose that the interpreter not begin an      11:46:43
11    interpretation of your question to my client until     11:46:47
12    Mr. Deluca has had an opportunity and has completed his 11:46:49
13    objection. Once he's done with the objection then the  11:46:52
14    interpretation can begin. That might solve the         11:46:55
15    problem. We do have people talking on top of each      11:46:59
16    other.                                                 11:47:02
17         MS. LEAL: I think there's an additional problem   11:47:03
18    because objections are being made to the response by   11:47:03
19    Mr. Demafeliz as it's being translated into English.   11:47:07
20         MR. NICOLAYSEN: That is an issue. The             11:47:12
21    objection needs to be to the question, not to the      11:47:14
22    answer, so if there's a motion to strike I would ask   11:47:16
23    Mr. Deluca please let my client finish his answer and  11:47:19
24    if you feel that his answer exceeds his competency as a 11:47:22
25    witness testifying about what other people knew or      11:47:26
```

Page 33

```
 1    understood, please let him finish then make your       11:47:28
 2    motion to strike.                                      11:47:30
 3         MR. DELUCA: Okay, I'll try to follow that.        11:47:31
 4    What I was trying to do is object when the interpreter 11:47:33
 5    finished interpreting into Tagalog to Mr. Demafeliz.   11:47:37
 6    That's what I was trying to do.                        11:47:40
 7         MR. NICOLAYSEN: I think it makes better sense     11:47:42
 8    for the interpreter not to even begin translating into 11:47:44
 9    Tagalog until Mr. Deluca has completed his objection.  11:47:47
10    This way Mr. Deluca does not feel rushed and has to    11:47:50
11    slip anything in. Is that accept to the Government?    11:47:54
12         MS. LEAL: That's fine.                            11:47:56
13         MR. NICOLAYSEN: Then let's do it that way.        11:47:57
14         MS. LEAL: Mr. Interpreter, if in between the      11:47:59
15    objection you need me to repeat the question, just ask 11:48:01
16    me to.                                                 11:48:04
17         MR. DELUCA: By the way, we are going to need a    11:48:19
18    restroom break soon.                                   11:48:21
19         MS. LEAL: This would be a good moment to break    11:48:22
20    since we've kind of stopped anyway. If the parties     11:48:25
21    agree, we will go off the record now for a brief break. 11:48:29
22         THE VIDEOGRAPHER: We are off the record at        11:48:33
23    11:48 a.m.                                             11:48:37
24         (Recess taken.)                                   11:48:39
25         THE VIDEOGRAPHER: We are back on record at        12:00:49
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**EXHIBIT E**
**41**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

## Page 34

1   12:00 p.m.                              12:01:01
2   BY MS. LEAL:                          12:01:04
3       Q.   Mr. Demafeliz, you last indicated that   12:01:06
4   you were paid $6,000 by Evelyn Pelayo; is that correct?   12:01:09
5       MR. DELUCA: Lacks foundation.        12:01:23
6   BY MS. LEAL:                          12:01:28
7       Q.   Was anyone else present when you were   12:01:28
8   paid $6,000?                          12:01:32
9       MR. DELUCA: Objection. Asked and answered.   12:01:39
10      THE INTERPRETER: He's asking about the   12:01:47
11  objection whether --                   12:01:50
12      MS. LEAL: Mr. Demafeliz, you may answer the   12:01:52
13  question.                             12:01:55
14      THE WITNESS: For what I remember there were   12:02:08
15  only two of us. When money was paid to me, that was   12:02:13
16  not seen by Ferdie.                    12:02:17
17      MR. DELUCA: Move to strike speculation.   12:02:19
18  Lacks foundation.                     12:02:22
19  BY MS. LEAL:                          12:02:23
20      Q.   Where was Ferdie when you were paid by   12:02:24
21  Evelyn, if you know?                   12:02:26
22      A.   What I remember is she asked him to get   12:02:31
23  inside the vehicle, that's what I remember.   12:02:38
24      Q.   And were you paid in the vehicle or   12:02:41
25  outside the vehicle?                   12:02:44

## Page 35

1       A.   I don't remember. I know that I was   12:02:45
2   given money in an envelope.            12:02:58
3       Q.   Okay. Special Agent Palomino is going to   12:03:01
4   place what has been marked for identification purposes   12:03:11
5   as Government's Exhibit 3.             12:03:15
6       (The document referred to was marked as   12:03:18
7   Exhibit 3 for identification.)          12:03:18
8   BY MS. LEAL:                          12:03:20
9       Q.   Please look at this and tell me if you   12:03:20
10  recognize the person in this picture.  12:03:23
11      A.   Yes, Rubenita Reyes.              12:03:28
12      Q.   How do you know Rubenita Reyes?     12:03:34
13      A.   The same as Ferdie, she called me about   12:03:39
14  her. I think she used to work for a relative of hers.   12:04:02
15      Q.   When you say "she called me about her,"   12:04:08
16  who is "she"?                         12:04:12
17      A.   Ate Evelyn. She asked me to help her so   12:04:14
18  that she can come here to the United States.   12:04:33
19      MR. DELUCA: Move to strike everything after Ate   12:04:36
20  Evelyn.                               12:04:39
21  BY MS. LEAL:                          12:04:40
22      Q.   You said Ate Evelyn called you; is that   12:04:41
23  correct?                              12:04:44
24      A.   Correct.                        12:04:44
25      Q.   Can you tell me about that phone call?   12:04:50

## Page 36

1       MR. DELUCA: Calls for hearsay.        12:04:59
2       THE WITNESS: What I remember is she asked me if   12:05:01
3   we have another competition because she wanted somebody   12:05:08
4   to come along to here. I told her yes and said okay,   12:05:17
5   that I help her to be able to come here.   12:05:32
6   BY MS. LEAL:                          12:05:35
7       Q.   So you agreed to help Evelyn bring   12:05:35
8   someone to the United States?          12:05:38
9       MR. DELUCA: Misstates his testimony.   12:05:49
10      THE WITNESS: Yes.                    12:05:50
11  BY MS. LEAL:                          12:05:51
12      Q.   What was -- was there a plan to bring   12:05:51
13  Rubenita to the United States?         12:05:56
14      A.   Yes, so that she will be able to help her   12:05:57
15  work in the facility, that she work there, that's what   12:06:15
16  I know.                               12:06:22
17      Q.   What -- when you say facility, what are   12:06:23
18  you referring to?                     12:06:27
19      A.   Taking care of the elderly.        12:06:28
20      Q.   And whose facility is this, do you know?   12:06:37
21      MR. DELUCA: Lacks foundation.        12:06:43
22      THE WITNESS: What I know is that belongs to Ate   12:06:49
23  Evelyn, only that.                    12:06:54
24  BY MS. LEAL:                          12:06:56
25      Q.   So after you -- after you had this phone   12:06:58

## Page 37

1   call from Evelyn, Ate Evelyn, what did you do, if   12:07:01
2   anything?                             12:07:05
3       MR. DELUCA: Misstates his testimony. He never   12:07:13
4   said the word telephone. Anyway, go ahead.   12:07:16
5       THE WITNESS: We met each other. What she did   12:07:26
6   is she went over to my gym and just like that.   12:07:31
7   BY MS. LEAL:                          12:07:34
8       Q.   Who did you meet?                 12:07:35
9       A.   Rubenita Reyes.                  12:07:36
10      Q.   Okay. Continue.                  12:07:42
11      A.   She knew already what she was supposed to   12:07:49
12  do, her purpose was you need to train well in order   12:07:52
13  that you will be included with the team. Yes, to train   12:08:02
14  and then to appear before the consul and, if necessary,   12:08:22
15  to be able to perform before the consul.   12:08:28
16      Q.   Why was that necessary?           12:08:31
17      A.   So that can pass getting the U.S. visa.   12:08:33
18      Q.   So what, if anything, did you do with   12:08:42
19  Ruby?                                 12:08:48
20      MR. DELUCA: The question is vague and   12:08:50
21  ambiguous. Overbroad. This is scripted.   12:08:52
22      THE INTERPRETER: He's asking what was his   12:09:04
23  objection.                            12:09:07
24  BY MS. LEAL:                          12:09:07
25      Q.   The question before you is what did you   12:09:07

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**EXHIBIT E**
**42**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 38

1   do, if anything, with Ruby.                  12:09:09
2        MR. DELUCA: Same objections.            12:09:12
3        MS. LEAL: I'm going to withdraw that question.  12:09:20
4   BY MS. LEAL:
5        Q.   After you met Ruby, what was your next  12:09:32
6   contact with Ruby?                           12:09:39
7        A.   When we saw each other she stayed in  12:09:41
8   Manila. I let her stay at the place that we rent  12:10:00
9   because she lives at a far place, then I said just stay  12:10:15
10  here so that she can practice every day.     12:10:19
11       Q.   How long did she -- approximately how  12:10:25
12  long did she stay in your rented place?      12:10:28
13       A.   For what I know, she stayed longer; maybe  12:10:30
14  five or six months.                          12:10:43
15       Q.   And did she attend your school?    12:10:44
16       A.   Yes, every day.                    12:10:53
17       Q.   Were you at the school?            12:10:57
18       A.   Yes.                              12:11:01
19       Q.   What did you do at the school?     12:11:04
20       A.   I teach there every day.           12:11:06
21       Q.   And what did -- if you know, what did  12:11:13
22  Ruby do at the school?                       12:11:17
23       MR. DELUCA: The question is vague, ambiguous,  12:11:23
24  overbroad.                                   12:11:27
25       THE WITNESS: Yes, she trained in preparation  12:11:28

Page 39

1   for the interview.                           12:11:33
2   BY MS. LEAL:                                 12:11:34
3        Q.   Did you train Rubenita?            12:11:35
4        A.   Yes.                              12:11:36
5        MR. DELUCA: The question was vague. Move to  12:11:45
6   strike.                                      12:11:47
7   BY MS. LEAL:                                 12:11:47
8        Q.   After you trained Rubenita did she -- did  12:11:48
9   she go to the Embassy, the American Embassy for an  12:11:51
10  interview?                                   12:11:57
11       MR. DELUCA: Lacks foundation.          12:11:57
12       THE WITNESS: Yes, I brought her.        12:12:03
13  BY MS. LEAL:                                 12:12:14
14       Q.   You brought her to the interview?  12:12:15
15       A.   Yes.                              12:12:17
16       Q.   Did you attend the interview?      12:12:20
17       A.   For what I know, I was just outside  12:12:28
18  because I did not have a schedule at the time.  12:12:36
19       Q.   And after the interview do you know if  12:12:40
20  Rubenita obtained a visa?                    12:12:47
21       A.   Yes, she was able to get the visa,  12:12:49
22  reason why we were able to travel to here. We were  12:13:03
23  together.                                    12:13:06
24       Q.   You traveled to the United States with  12:13:08
25  Rubenita?                                    12:13:10

Page 40

1        A.   Yes.                              12:13:12
2        Q.   And after you arrived at United States  12:13:17
3   where did you go?                            12:13:29
4        A.   For what I know is that from the airport  12:13:31
5   I took her directly to a meeting place with Evelyn  12:13:51
6   because she was already expecting it.        12:13:56
7        Q.   When you say you took "her," who are you  12:13:58
8   referring to?                                12:14:01
9        A.   Rubenita Reyes.                    12:14:01
10       Q.   And do you recall where the meeting place  12:14:05
11  was with Evelyn?                             12:14:09
12       A.   I don't remember exactly, but it's like a  12:14:10
13  restaurant. It was like a restaurant.        12:14:26
14       Q.   What occurred when you met Evelyn?  12:14:33
15       MR. DELUCA: Lacks foundation.          12:14:40
16       MS. LEAL: Strike that question.        12:14:43
17  BY MS. LEAL:                                 12:14:45
18       Q.   Did you meet Evelyn?              12:14:45
19       A.   Yes.                              12:14:46
20       Q.   And what occurred?                12:14:50
21       A.   I delivered Rubenita and at the time I  12:14:52
22  was paid $6,000.                             12:15:08
23       Q.   Who were you paid $6,000 by?       12:15:10
24       A.   Ate Evelyn.                       12:15:13
25       Q.   And in what form was the $6,000 in?  12:15:19

Page 41

1        A.   What I remember is they are in an  12:15:23
2   envelope and they are $100 bills.            12:15:37
3        Q.   Is that all the money you were paid by  12:15:39
4   Evelyn for bringing Rubenita?                12:15:43
5        MR. DELUCA: Lacks foundation that's what the  12:15:53
6   money was for.                               12:15:55
7        MS. LEAL: Withdraw that question.      12:15:57
8   BY MS. LEAL:                                 12:15:59
9        Q.   Why were you paid $6,000 by Evelyn?  12:16:00
10       MR. DELUCA: Calls for speculation.     12:16:06
11  BY MS. LEAL:                                 12:16:06
12       Q.   If you know.                      12:16:09
13       Mr. DELUCA: Calls for speculation.     12:16:09
14       THE WITNESS: I'm doing this so that I can  12:16:12
15  support my team that is coming here, but we already  12:16:22
16  have an agreement that if I'm able to take them that I  12:16:29
17  will be given that amount.                   12:16:36
18  BY MS. LEAL:                                 12:16:39
19       Q.   Able to take who?                 12:16:41
20       THE INTERPRETER: I'm sorry?            12:16:44
21  BY MS. LEAL:                                 12:16:44
22       Q.   The question is when you say able to take  12:16:45
23  who, what are you referring to?             12:16:48
24       MR. DELUCA: Misstates his testimony.   12:16:51
25       THE WITNESS: Rubenita Reyes.           12:16:57

11 (Pages 38 to 41)

**EXHIBIT E**
**43**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 42

1   BY MS. LEAL:                                    12:16:59
2       Q.   You say you were paid $6,000 for bringing   12:17:47
3   Rubenita. Is that the entire amount you were paid?   12:17:52
4       MR. DELUCA: Misstates his testimony. Lacks    12:17:58
5   foundation. Calls for speculation.              12:18:02
6       THE WITNESS: That was the amount that is paid   12:18:09
7   for everyone, but what I know is that before that, $800   12:18:30
8   is being paid so that -- for the visa and also in   12:18:36
9   preparation so that we can travel to other countries.   12:18:43
10  BY MS. LEAL:                                    12:18:47
11      Q.   You mentioned an agreement with Evelyn a   12:18:48
12  few minutes ago. Can you tell me about that agreement?   12:18:52
13      MR. DELUCA: Calls for speculation.          12:19:01
14      THE WITNESS: If I am able to take them, then I   12:19:03
15  will be paid $6,000.                            12:19:14
16  BY MS. LEAL:                                    12:19:17
17      Q.   What are you referring to when you say   12:19:19
18  "them"?                                         12:19:21
19      A.   For everyone that I take, I will be paid   12:19:32
20  $6,000.                                         12:19:37
21      Q.   When you say "everyone you take," who are   12:19:41
22  you referring to when you say "everyone"?       12:19:49
23      A.   Like it started with Ferdie, then       12:19:56
24  following was Ruby.                             12:20:10
25      MR. DELUCA: Move to strike as nonresponsive.   12:20:12

Page 43

1   BY MS. LEAL:                                    12:20:14
2       Q.   And when you say "take," what do you mean   12:20:14
3   by take, taking them?                           12:20:17
4       A.   Take them over here so that they can work   12:20:25
5   at her home care.                               12:20:33
6       Q.   And just to be clear, where is "here"?   12:20:35
7       A.   Here in California, America.           12:20:40
8       Q.   And where were you taking them from to   12:20:49
9   America?                                        12:20:53
10      A.   From the Philippines I'll take them here   12:20:54
11  to L.A.                                         12:21:05
12      Q.   And who do you have this agreement with?   12:21:06
13      MR. DELUCA: Calls for a legal conclusion.   12:21:16
14      THE WITNESS: Evelyn, only the two of us.    12:21:18
15  BY MS. LEAL:                                    12:21:20
16      Q.   You testified earlier that you have     12:21:23
17  traveled with your teams to competitions in the United   12:21:25
18  States.                                         12:21:35
19      A.   Correct.                               12:21:40
20      Q.   When you are bringing a team member are   12:21:41
21  you always bringing them to Evelyn?             12:21:46
22      MR. DELUCA: The question is vague.          12:21:57
23      THE WITNESS: Will you repeat the question,   12:21:59
24  please?                                         12:22:01
25      ///                                         12:22:02

Page 44

1   BY MS. LEAL:                                    12:22:29
2       Q.   You have testified earlier that you bring   12:22:29
3   your teams to competitions in the United States; is   12:22:32
4   that correct?                                   12:22:36
5       A.   Correct.                               12:22:39
6       Q.   And sometimes your teams have five team   12:22:51
7   members, sometimes they have 12; is that correct?   12:22:55
8       MR. DELUCA: Leading.                        12:22:58
9   BY MS. LEAL:                                    12:23:00
10      Q.   Withdraw that.                         12:23:02
11      You previously said your team members --    12:23:03
12  your teams that traveled internationally sometimes have   12:23:05
13  five members and sometimes had 12?              12:23:10
14      MR. DELUCA: Misstates the testimony.        12:23:15
15      THE WITNESS: Correct.                       12:23:30
16  BY MS. LEAL:                                    12:23:30
17      Q.   When you traveled to tournaments in the   12:23:32
18  United States were your team members always -- were all   12:23:35
19  of your team members traveling to Taekwondo tournaments   12:23:42
20  to compete?                                     12:23:46
21      MR. DELUCA: The question is vague as to time.   12:24:06
22      THE WITNESS: Most of my team members come to   12:24:09
23  compete like, but the exception is like Ruby who did   12:24:22
24  not compete.                                    12:24:25
25      ///                                         12:24:27

Page 45

1   BY MS. LEAL:                                    12:24:27
2       Q.   Did Ruby compete in any tournaments in   12:24:27
3   the United States, if you know?                 12:24:30
4       A.   No.                                    12:24:32
5       Q.   Did Ferdinand Espiritu compete in any   12:24:39
6   tournaments in the United States, if you know?   12:24:42
7       MR. DELUCA: Lacks foundation.              12:24:48
8       THE WITNESS: No.                            12:24:49
9   BY MS. LEAL:                                    12:24:50
10      Q.   Special Agent Palomino is placing before   12:25:22
11  you what has been marked for identification purposes as   12:25:25
12  Government Exhibit 4.                           12:25:29
13      (The document referred to was marked as     12:25:31
14  Exhibit 4 for identification.)
15  BY MS. LEAL:                                    12:25:33
16      Q.   Can you please -- can you please look at   12:25:38
17  that photo and tell me if you recognize that person?   12:25:41
18      A.   Yes, Eden Ronquillo.                   12:25:47
19      Q.   How do you know Eden Ronquillo?        12:25:57
20      A.   What I know is that she's a niece of Ate   12:26:01
21  Evelyn and she asked her to go over to me.      12:26:12
22      MR. DELUCA: Move to strike as speculation.   12:26:18
23  Also hearsay.                                   12:26:20
24  BY MS. LEAL:                                    12:26:21
25      Q.   You said that she asked you to come     12:26:22

12 (Pages 42 to 45)

**EXHIBIT E
44**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 46

1  over -- sorry, could I have the court reporter please    12:26:26
2  repeat the answer.                    12:26:30
3        (Record read:              12:26:31
4        "A.  What I know is that she's a niece
5        of Ate Evelyn and she asked her to go
6        over to me.")            12:26:44
7  BY MS. LEAL:                12:26:44
8     Q.   Who asked her to go over?      12:26:47
9     A.   Ate Evelyn, she said that she's going to   12:26:51
10 send her niece to me.          12:27:04
11    Q.   At this time the videographer has   12:27:08
12 indicated that they need to change the tapes.  If the   12:27:12
13 parties agree, we can go off record to allow that to be   12:27:15
14 done.                  12:27:18
15       MR. DELUCA:  Of course.      12:27:18
16       MR. NICOLAYSEN:  No objection.    12:27:19
17       THE VIDEOGRAPHER:  This marks the end of   12:27:20
18 videotape number one in the deposition of Rodolfo   12:27:22
19 Demafeliz, Jr.  We are off record at 12:27 p.m.   12:27:25
20       (Recess taken.)          12:27:30
21       THE VIDEOGRAPHER:  Here begins videotape number   12:32:15
22 two in the deposition of Rodolfo Demafeliz, Jr.  We are   12:32:48
23 back on record at 12:32 p.m.        12:32:51
24 BY MS. LEAL:                12:32:54
25    Q.   Mr. Demafeliz, you said that Ate   12:32:58

Page 47

1  Evelyn -- withdraw that.            12:33:01
2        Can you please look at Exhibit 4 again.   12:33:10
3  Who is that?                12:33:17
4        MR. DELUCA:  Asked and answered.  It's Den   12:33:19
5  Ronquillo.                12:33:24
6        THE WITNESS:  Eden Ronquillo.    12:33:25
7  BY MS. LEAL:                12:33:27
8     Q.   -- have you ever met Eden Ronquillo   12:33:27
9  in person?                12:33:31
10    A.   The only time that we met each other is   12:33:32
11 that when Ate Evelyn sent her to me for me to help her.   12:33:50
12       MR. DELUCA:  Move to strike as not responsive.   12:33:56
13 It's a yes, no.              12:33:58
14 BY MS. LEAL:                12:33:59
15    Q.   When did you meet Eden Ronquillo?  I'm   12:34:05
16 sorry.  Where did you meet Eden Ronquillo?    12:34:10
17    A.   I don't remember the place, but what I   12:34:12
18 know is that she went over to my gym to train.   12:34:34
19       MR. DELUCA:  Move to strike everything he said   12:34:39
20 after "I don't recall."        12:34:43
21 BY MS. LEAL:                12:34:44
22    Q.   How long did she train in your gym, do   12:34:45
23 you know?                12:34:48
24       MR. DELUCA:  Lacks foundation.    12:34:49
25       THE WITNESS:  Usually it takes about three   12:34:52

Page 48

1  months.  That is the normal.          12:35:00
2  BY MS. LEAL:                12:35:02
3     Q.   But my question to you is do you recall   12:35:02
4  how long Den Ronquillo trained in your gym   12:35:04
5  approximately?              12:35:09
6        MR. DELUCA:  Lacks foundation.    12:35:14
7        THE WITNESS:  I don't really remember how long   12:35:20
8  she trained because I have several, I have lots of   12:35:24
9  students and it has been a long time.      12:35:27
10 BY MS. LEAL:                12:35:31
11    Q.   Okay.                12:35:31
12       MR. DELUCA:  Move to strike everything after he   12:35:42
13 doesn't recall how long she trained.      12:35:44
14 BY MS. LEAL:                12:35:53
15    Q.   What was your understanding as to why Ate   12:36:12
16 Evelyn sent Eden Ronquillo to your gym?    12:36:14
17       MR. DELUCA:  Hearsay.        12:36:19
18       THE INTERPRETER:  I'm sorry.  I didn't hear the   12:36:21
19 last --                12:36:23
20 BY MS. LEAL:                12:36:23
21    Q.   What was your understanding as to why Ate   12:36:23
22 Evelyn sent Eden to you?          12:36:26
23       MR. DELUCA:  Hearsay.  Calls for speculation.   12:36:29
24 Lacks foundation.            12:36:32
25       THE WITNESS:  For what I understand and what I   12:36:36

Page 49

1  know is that she is her niece and that the purpose is   12:36:57
2  that so that she may be able to come here and see the   12:37:02
3  United States.              12:37:06
4        MR. DELUCA:  Move to strike as speculation.   12:37:07
5  BY MS. LEAL:                12:37:09
6     Q.   Did Ate -- did Evelyn contact you in   12:37:10
7  regards to Eden Ronquillo?          12:37:13
8        MR. DELUCA:  The question is vague as to time.   12:37:21
9        THE WITNESS:  Yes, it has always been like that.   12:37:27
10 BY MS. LEAL:                12:37:33
11    Q.   How did she contact you?      12:37:33
12       MR. DELUCA:  Move to strike everything after   12:37:35
13 "yes."                  12:37:37
14       THE WITNESS:  The thing is always she's here in   12:37:50
15 the United States, I'm in the Philippines, and then   12:38:00
16 usually the question is, is there a coming tournament,   12:38:03
17 will you be able to take along this individual.   12:38:07
18 BY MS. LEAL:                12:38:11
19    Q.   When you say --          12:38:11
20       MR. DELUCA:  Move to strike as nonresponsive to   12:38:11
21 the question.              12:38:14
22       THE WITNESS:  What is the question?    12:38:18
23 BY MS. LEAL:                12:38:20
24    Q.   Mr. Demafeliz, how did Evelyn contact you   12:38:20
25 regarding Eden Ronquillo?          12:38:26

13 (Pages 46 to 49)

**EXHIBIT E**
**45**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 50

```
 1      MR. DELUCA: Lacks foundation. Calls for   12:38:29
 2   speculation.                          12:38:33
 3      THE WITNESS: By telephone. She will go to gym   12:38:43
 4   that I'm going to help her.              12:38:48
 5   BY MS. LEAL:                          12:38:50
 6      Q.   Okay. Can you tell me --          12:38:50
 7      MR. DELUCA: Move to strike everything after "by   12:38:51
 8   telephone."                          12:38:54
 9   BY MS. LEAL:                          12:38:54
10      Q.   Can you please tell me about the   12:38:55
11   telephone conversation with Evelyn Pelayo?   12:38:56
12      MR. DELUCA: The question is vague as to time.   12:39:08
13      THE WITNESS: Because always been like that,   12:39:11
14   whenever she wanted somebody to be able to come here   12:39:23
15   then she would contact me and ask me whether he or she   12:39:27
16   can be included with the team.          12:39:32
17      MR. DELUCA: Move to strike as completely   12:39:33
18   nonresponsive.                       12:39:36
19   BY MS. LEAL:                          12:39:38
20      Q.   Mr. Demafeliz, can you please tell me   12:39:38
21   about that specific phone conversation you had with   12:39:40
22   Evelyn Pelayo regarding Eden Ronquillo?   12:39:44
23      MR. DELUCA: Objection. Hearsay. Objection.   12:39:51
24   Hearsay.                          12:39:56
25      THE WITNESS: It's the same way, if I am able to   12:39:57
```

Page 51

```
 1   help individual to come here then I will be paid $6,000   12:40:13
 2   and it is the same case as with her niece.   12:40:19
 3      MR. DELUCA: Move to strike as nonresponsive,   12:40:23
 4   completely nonresponsive.              12:40:25
 5   BY MS. LEAL:                          12:40:27
 6      Q.   After that phone conversation did you   12:40:28
 7   help Eden Ronquillo come to the United States?   12:40:31
 8      MR. DELUCA: Lacks foundation.          12:40:35
 9      THE WITNESS: Yes. Like before, she stayed   12:40:42
10   first in the house that we were renting while training.   12:40:55
11   BY MS. LEAL:                          12:40:59
12      Q.   Continue.                     12:41:00
13      MR. DELUCA: Move to strike, nonresponsive.   12:41:01
14      THE WITNESS: I did the same as with the others,   12:41:05
15   I did everything that I can to help that she may be   12:41:17
16   able to come so that I can get paid.      12:41:21
17      MR. DELUCA: Move to strike as nonresponsive.   12:41:24
18   BY MS. LEAL:                          12:41:25
19      Q.   Can you please explain what you mean by   12:41:26
20   you did everything you could, what exactly did you do?   12:41:29
21      MR. DELUCA: The question is vague. We don't   12:41:34
22   know what transaction we're referring to in the   12:41:41
23   question. We don't know who, what, where, when, how.   12:41:44
24   His answers are global and so the question must be   12:41:46
25   global. Compound. Overbroad. Vague. Ambiguous.   12:41:50
```

Page 52

```
 1      MS. LEAL: Are you done, Mr. Deluca?    12:41:56
 2      MR. DELUCA: I'm done for this question.   12:41:58
 3   BY MS. LEAL:                          12:42:01
 4      Q.   Mr. Demafeliz, you can answer the   12:42:01
 5   question now.                       12:42:03
 6      A.   She called me and asked, "Will you be   12:42:04
 7   able to take along my niece?"  So that's what I did.   12:42:16
 8   She stayed at the place that I rented and then she   12:42:43
 9   trained and I did everything in order to help her and   12:42:47
10   then I was given $800 for the visa and Asian travel.   12:42:50
11      MR. DELUCA: Move to strike as nonresponsive to   12:42:58
12   the question.                       12:43:00
13   BY MS. LEAL:                          12:43:01
14      Q.   When you say you did everything you could   12:43:01
15   to help her, can you tell me about the specific things   12:43:03
16   you did to help Eden Ronquillo?          12:43:09
17      MR. DELUCA: The question is vague and   12:43:24
18   ambiguous, overbroad, and unintelligible.   12:43:27
19      THE WITNESS: Like that, I train her well.   12:43:31
20   BY MS. BAKSHI:                       12:43:34
21      Q.   Okay. Tell me about the training, what   12:43:35
22   did you train her in?                  12:43:38
23      A.   Every day she came to the gym and she   12:43:42
24   practiced, she memorized like the name of the kick and   12:43:47
25   gave the terminology in Taekwondo. That was in   12:44:00
```

Page 53

```
 1   preparation so that when the interview come, then she   12:44:07
 2   may be able to answer all the questions. The big thing   12:44:11
 3   is that she be able to go to another country so that   12:44:21
 4   she will have an exposure outside. I did all of those   12:44:25
 5   so that everything will be all right and well prepared   12:44:40
 6   so that she will be able to pass the interview.   12:44:45
 7      MR. DELUCA: Move to strike as nonresponsive.   12:44:47
 8   BY MS. LEAL:                          12:44:49
 9      Q.   When you refer to the interview, what are   12:44:50
10   you referring to?                     12:44:52
11      A.   That was interview at the U.S. Embassy to   12:44:53
12   obtain a visa.                       12:45:07
13      Q.   And did Eden Ronquillo obtain a United   12:45:08
14   States visa, if you know?              12:45:13
15      A.   Yes, she was able to get a visa.      12:45:17
16      Q.   And, if you know, what was the purpose of   12:45:25
17   that visa?                          12:45:27
18      MR. DELUCA: Calls for speculation.      12:45:33
19      THE WITNESS: The purpose of the visa is to be   12:45:34
20   able to participate here in the United States.   12:45:45
21   BY MS. BAKSHI:                       12:45:49
22      Q.   And how do you know that?          12:45:50
23      A.   We receive an invitation, I included her   12:45:51
24   to be a member of the team.              12:46:01
25      Q.   When you say you received an invitation,   12:46:03
```

14 (Pages 50 to 53)

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**EXHIBIT E**
**46**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 54

1  can you explain what you mean by invitation?        12:46:06
2      A.   An invitation that there is a competition   12:46:10
3  that was going to happen and that's the one that we   12:46:23
4  used.                                                12:46:28
5      Q.   Where was the invitation -- where was the   12:46:28
6  competition going to take place?                     12:46:34
7      A.   For what I know and usually it is in        12:46:36
8  Las Vegas.                                           12:46:44
9      Q.   Okay.  And you said -- did you make her a   12:46:45
10  member of your team?                                 12:46:51
11      MR. DELUCA:  The question is vague as to the    12:46:56
12  meaning of "make her."                               12:46:57
13      THE WITNESS:  I did to make her as one of the   12:47:01
14  players because only coach and players are able to   12:47:14
15  secure or get a visa.                                12:47:18
16  BY MS. LEAL:                                         12:47:20
17      Q.   How do you make someone a member of the    12:47:21
18  team?                                                12:47:23
19      A.   Her companions are all good and they are   12:47:27
20  really black belt, but then I'm going to include her to  12:47:47
21  be with them.                                        12:47:51
22      Q.   Okay.  Was Eden Ronquillo a black belt,    12:47:52
23  if you know?                                         12:48:00
24      MR. DELUCA:  The question is vague as to time.  12:48:02
25      THE WITNESS:  No.                                12:48:05

Page 55

1  BY MS. LEAL:                                          12:48:09
2      Q.   Do you know if Eden Ronquillo traveled on   12:48:15
3  that U.S. visa?                                       12:48:20
4      A.   Yes, she was with me.                        12:48:22
5      Q.   When you say "she was with me," do you --   12:48:32
6      A.   Eden Ronquillo.                              12:48:42
7      Q.   What do you mean she was with you?          12:48:43
8      A.   When she traveled to here, we were          12:48:45
9  together.                                             12:48:53
10      Q.   Okay.  And by "here," where are you         12:48:54
11  referring to?                                        12:48:56
12      A.   Here in U.S., America.                      12:48:57
13      Q.   Okay.  When you and Eden Ronquillo          12:49:05
14  arrived in the United States where did you go?       12:49:08
15      A.   We were still in the Philippines and Ate   12:49:11
16  Evelyn knows and expected us that we will come.      12:49:27
17      MR. DELUCA:  Move to strike as nonresponsive.   12:49:32
18      THE WITNESS:  There is already a place where we 12:49:37
19  are going to see each other so I can deliver Eden.   12:49:43
20      MR. DELUCA:  Move to strike as nonresponsive.   12:49:48
21  BY MS. LEAL:                                         12:49:50
22      Q.   When you arrived at United States where    12:49:50
23  did you go?                                          12:49:53
24      MR. DELUCA:  The question is vague as to time.  12:49:57
25      THE WITNESS:  What I know is that we went       12:50:04

Page 56

1  straight to our meeting place.  I don't remember     12:50:09
2  exactly whether it was a McDonald's.                 12:50:12
3  BY MS. LEAL:                                          12:50:14
4      Q.   When you say "we went," who are you         12:50:15
5  referring to?                                         12:50:17
6      A.   We separated from the team.  I was with     12:50:19
7  Eden Ronquillo.                                       12:50:33
8      Q.   Okay.  And when you and Eden went to the    12:50:34
9  meeting place who did you meet?                       12:50:41
10      A.   Only Ate Evelyn.  She was by herself.      12:50:43
11      MR. DELUCA:  Can we take a break for a moment?  12:50:57
12  Let's go off the record.                             12:50:59
13      MS. LEAL:  Agreed.                               12:51:01
14      THE VIDEOGRAPHER:  We are off record at 12:51   12:51:03
15  p.m.                                                 12:51:10
16      (Off the record.)                               12:51:11
17      (A luncheon recess was taken at 12:51 p.m.)
18
19
20
21
22
23
24
25

Page 57

1  APPEARANCES OF COUNSEL:
2      (P.M. SESSION)
3
4  SANDY LEAL, ESQ.
5  KAYLA BAKSHI, ESQ.
6  GREGORY NICOLAYSEN, ESQ.
7  PHILIP DELUCA, ESQ.
8
9
10
11
12  ALSO PRESENT:
13  MIGUEL PALAMINO
14  TRICIA WHITEHILL
15  EVELYN PELAYO
16  DARWIN PADOLINA
17  DOUGLAS STEVENS - VIDEOGRAPHER
18  JOSHUA MENDOZA - INTERPRETER
19
20
21  REPORTED BY:
22
23  SHAWNA HIGGINS, CSR NO. 10646
24
25

15  (Pages 54 to 57)

**EXHIBIT E**
**47**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 58

1    (The deposition of RODOLFO DEMAFELIZ,
2  JR., was reconvened at 1:52 p.m.)
3
4       RODOLFO DEMAFELIZ, JR.,
5  having been previously duly sworn, testified further as
6  follows:
7
8       EXAMINATION
9                                           01:52:41
10      THE VIDEOGRAPHER:  We are on record at 1:52 p.m.   01:52:41
11  BY MS. LEAL:                               01:53:01
12      Q.   Mr. Demafeliz, what, if anything,   01:53:04
13  happened when you met Evelyn?              01:53:06
14      MR. DELUCA:  The question is vague as to   01:53:10
15      THE WITNESS:  Regarding?               01:53:16
16  BY MS. LEAL:
17      Q.   You last testified before break that you   01:53:21
18  and Eden Ronquillo met Evelyn at a meeting place; is   01:53:24
19  that correct?                              01:53:30
20      A.   Correct.                          01:53:40
21      Q.   What, if anything, happened when you met   01:53:41
22  Evelyn?                                    01:53:43
23      A.   She took Eden and then I was paid $6,000   01:53:44
24  for Eden.                                  01:54:07
25      Q.   Who paid you $6,000?              01:54:08

Page 59

1      MR. DELUCA:  Move to strike as speculative.   01:54:11
2      THE WITNESS:  Ate Evelyn.              01:54:14
3      MR. DELUCA:  Move to strike as speculative.   01:54:16
4  BY MS. LEAL:                               01:54:19
5      Q.   In what form were you paid $6,000 by   01:54:19
6  Evelyn?                                    01:54:22
7      A.   The same way, in an envelope $100 bills.   01:54:23
8      Q.   Special Agent Palomino is now going to   01:54:35
9  place before you what has been marked for   01:54:44
10  identification purposes as Government's Exhibit   01:54:48
11  Number 5.                                  01:54:51
12      (The document referred to was marked as   01:54:51
13  Exhibit 5 for identification.)
14  BY MS. LEAL:                               01:54:52
15      Q.   Please take a look at that exhibit and   01:54:58
16  tell me if you recognize that person?      01:55:00
17      A.   She's Angela Guanzon.             01:55:03
18      Q.   How did you know Angela Guanzon?   01:55:13
19      A.   The same way, she was sent by Evelyn so   01:55:25
20  that she can train in Taekwondo to be able to come with   01:55:32
21  the team.                                  01:55:36
22      Q.   Were you contacted by Evelyn in regard to   01:55:37
23  Angela Guanzon?                            01:55:41
24      A.   Yes, I was called on my cell phone.   01:55:45
25      Q.   Okay.  And who called you on your cell   01:55:52

Page 60

1  phone?                                     01:55:55
2      A.   Ate Evelyn.                       01:55:55
3      Q.   What was said during that telephone   01:55:59
4  conversation?                              01:56:02
5      MR. DELUCA:  Calls for hearsay.         01:56:05
6      THE WITNESS:  She need another worker so that I   01:56:08
7  have to help her, I need to help her to be able to come   01:56:30
8  to the United States to work.              01:56:35
9  BY MS. LEAL:                               01:56:37
10      Q.   You were -- who were you going to help   01:56:39
11  come to the United States to work?         01:56:42
12      A.   Angela Guanzon.                   01:56:44
13      Q.   And who needed another worker?     01:56:51
14      A.   Ate Evelyn.                       01:56:57
15      Q.   Did you agree to do this?          01:57:04
16      A.   Yes.                              01:57:06
17      Q.   Why did you agree to do this?      01:57:10
18      A.   So that my team will have money for   01:57:13
19  expenses to come here to participate in competition.   01:57:24
20      Q.   What did you do in order to bring Angela   01:57:28
21  to the United States?                      01:57:32
22      A.   I trained her and I let her stay in the   01:57:33
23  apartment that we were renting.  And then in   01:57:50
24  preparation for the interview to be able to get a visa,   01:58:05
25  I provided her with certificates.          01:58:09

Page 61

1      Q.   Special Agent Palomino is now going to   01:58:13
2  place before you what has been marked as Government's   01:58:18
3  Exhibit Number 6.                          01:58:22
4      (The document referred to was marked as   01:58:24
5  Exhibit 6 for identification.)
6  BY MS. LEAL:                               01:58:31
7      Q.   Do you recognize this document?     01:58:33
8      A.   Yes.                              01:58:39
9      Q.   What is this?                      01:58:39
10      A.   Employment certification to certify that   01:58:40
11  she was teaching martial arts.             01:58:55
12      Q.   Who was teaching martial arts?      01:58:57
13      A.   Angela Guanzon.                   01:59:00
14      Q.   And how do you recognize this document?   01:59:02
15      MR. DELUCA:  The question is vague.     01:59:11
16      THE WITNESS:  She was with us every day at   01:59:17
17  the gym.                                   01:59:21
18      MR. DELUCA:  Move to strike as nonresponsive.   01:59:18
19  BY MS. LEAL:                               01:59:24
20      Q.   Mr. Demafeliz, I'm asking you how do you   01:59:25
21  recognize this document?                   01:59:28
22      MR. DELUCA:  Same objection.  Vague.    01:59:39
23      THE WITNESS:  This is my signature.     01:59:42
24  BY MS. LEAL:                               01:59:43
25      Q.   Okay.  So do you see your signature on   01:59:43

16 (Pages 58 to 61)

**EXHIBIT E**
**48**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 62

1  the lower right-hand corner?  01:59:46
2      A.  Yes.  01:59:48
3      Q.  Did you sign it?  01:59:54
4      A.  Yes.  01:59:55
5      Q.  And who created this document, if you  01:59:57
6  know?  02:00:01
7      A.  Myself.  02:00:01
8      Q.  Is the information in this document true?  02:00:15
9      MR. DELUCA:  The question is vague.  02:00:18
10      THE WITNESS:  No.  02:00:20
11  BY MS. LEAL:  02:00:20
12      Q.  Did Angela Guanzon, was she your  02:00:20
13  assistant Taekwondo instructress in September, on  02:00:24
14  September 21, 2005?  02:00:31
15      A.  September what?  02:00:34
16      Q.  September 21, 2005.  02:00:45
17      A.  No.  02:00:51
18      Q.  Was she paid 133,000 Filipino currency --  02:00:52
19      MR. DELUCA:  The question is vague.  02:01:04
20  BY MS. LEAL:  02:01:11
21      Q.  -- as a salary?  02:01:12
22      MR. DELUCA:  Same objection.  02:01:15
23      THE WITNESS:  No.  02:01:16
24  BY MS. LEAL:  02:01:16
25      Q.  Why did you create this document?  02:01:17

Page 63

1      A.  To be able to help for her interview for  02:01:19
2  U.S. visa so that she will be able to pass.  02:01:34
3      Q.  Special Agent Palomino is now placing  02:01:38
4  before you what has been marked as Government's -- for  02:01:41
5  identification purposes Government's Exhibit Number 7.  02:01:45
6      (The document referred to was marked as  02:01:48
7  Exhibit 7 for identification.)
8  BY MS. LEAL:
9      Q.  Please take a moment and look at it and  02:01:56
10  let me know if you recognize this document.  02:01:59
11      A.  Yes.  02:02:01
12      Q.  Does this document contain your signature  02:02:05
13  on the right, lower right-hand corner?  02:02:08
14      A.  Yes, that's my signature.  02:02:12
15      Q.  What is this document?  02:02:20
16      A.  Certifying that she is a black belt.  02:02:23
17      Q.  When you say "she," who are you referring  02:02:30
18  to?  02:02:33
19      A.  Angela Guanzon.  02:02:33
20      Q.  Who created this document?  02:02:38
21      A.  Myself.  02:02:41
22      Q.  Is the information in this document that  02:02:47
23  Ms. Angela Guanzon is a first Dan black belt true?  02:02:51
24      A.  No.  02:03:00
25      Q.  Why did you create this document?  02:03:05

Page 64

1      A.  So that she will be able to use it for  02:03:08
2  interview.  02:03:19
3      Q.  Special Agent Palomino is now going to  02:03:20
4  place before you what has been marked as  02:03:24
5  Government's -- what's been marked for identification  02:03:26
6  purposes as Government's Exhibit 8.  02:03:29
7      (The document referred to was marked as
8  Exhibit 8 for identification.)
9  BY MS. LEAL:  02:03:38
10      Q.  Please take a moment and look at this  02:03:41
11  document and tell me if you recognize it.  02:03:43
12      A.  Yes, that is my signature.  02:03:51
13      Q.  Is that your signature on the lower  02:03:53
14  left-hand corner?  02:03:56
15      A.  Yes.  02:03:57
16      Q.  Who created this document?  02:04:01
17      A.  Me, myself.  02:04:04
18      Q.  And why did you create this document?  02:04:09
19      A.  For the purpose of being able to help her  02:04:12
20  in her interview.  02:04:24
21      Q.  When you say "her," who are you referring  02:04:25
22  to?  02:04:28
23      A.  Angela Guanzon.  02:04:28
24      Q.  Is the information in this document that  02:04:32
25  Angela Guanzon attended a Taekwondo summer clinic in  02:04:36

Page 65

1  May 2000 true?  02:04:41
2      MR. DELUCA:  Misstates the contents of the  02:04:49
3  document.  02:04:52
4      THE WITNESS:  This is a -- this is a summer  02:05:02
5  clinic that is done every summer.  This is the  02:05:05
6  certificate that is given to those who conduct summer  02:05:19
7  class.  02:05:25
8  BY MS. LEAL:  02:05:26
9      Q.  Did Angela --  02:05:26
10      MR. DELUCA:  Move to strike as nonresponsive.  02:05:27
11  BY MS. LEAL:  02:05:29
12      Q.  Was Angela Guanzon given a certificate in  02:05:29
13  May 2000 for completing a Taekwondo summer clinic?  02:05:34
14      A.  No.  02:05:40
15      Q.  Did she ever attend a Taekwondo summer  02:05:49
16  clinic in summer, if you know?  02:05:52
17      A.  No.  02:05:54
18      Q.  Special Agent Palomino is now placing  02:06:00
19  before you what has been marked for identification  02:06:06
20  purposes as Government's Exhibit 9.  02:06:08
21      (The document referred to was marked as  02:06:12
22  Exhibit 9 for identification.)
23  BY MS. LEAL:  02:06:15
24      Q.  Please take a moment and look at this  02:06:16
25  document and tell me if you recognize it.  02:06:18

17  (Pages 62 to 65)

**EXHIBIT E**
**49**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 66

1    A.   Yes.                         02:06:21
2    Q.   How do you recognize it?     02:06:28
3    A.   These are the answers or the ones that   02:06:30
4  has been answered like by the ones who have been   02:06:53
5  interviewed before that when one goes to interview,   02:06:57
6  these are the answers that they need to provide.  I   02:07:00
7  provided this to Angela because she is somewhat having   02:07:08
8  a hard time with English.            02:07:13
9    Q.   Do you know who created this document?   02:07:16
10   A.   Myself.                      02:07:18
11   Q.   And why did you provide this document to   02:07:22
12 Angela Guanzon?                      02:07:26
13   A.   So that she can memorize this in case one   02:07:27
14 of the questions that is in here will be asked, then   02:07:42
15 she will be able to answer right away.   02:07:47
16   Q.   If you know, was Angela Guanzon able to   02:07:57
17 obtain a visa to come to the United States?   02:07:59
18   A.   Yes, we traveled together.   02:08:11
19   Q.   When you say you traveled together, where   02:08:13
20 did you travel to?                   02:08:16
21   A.   Angela, together with the team, we all   02:08:17
22 went to Las Vegas.                   02:08:34
23   Q.   And what was the purpose of traveling to   02:08:35
24 Las Vegas?                           02:08:38
25   A.   So that we can participate in   02:08:39

Page 67

1  competition.                         02:08:47
2    Q.   Did you participate in a competition in   02:08:48
3  Las Vegas at that time?              02:08:51
4    A.   Yes, we participated.         02:08:55
5    Q.   Did Angela Guanzon participate, if you   02:08:59
6  know?                                02:09:02
7    A.   No, she did not participate.   02:09:02
8    Q.   After the competition in Las Vegas where   02:09:09
9  did you go?                          02:09:14
10   A.   What I know is we stayed two days at the   02:09:14
11 house of my older sister and then after that I called   02:09:26
12 Ate Evelyn so she can pick her up.   02:09:36
13   Q.   When you say "we stayed at my sister's   02:09:39
14 house," who are you referring to when you say "we"?   02:09:42
15   A.   Angela Guanzon.               02:09:45
16   Q.   And when you said you called Angela to   02:09:55
17 take her to -- sorry.  Strike all that.   02:09:59
18      When you said you called Evelyn, why did   02:10:03
19 you call Evelyn?                     02:10:07
20   A.   So that she can pick up Angela and also   02:10:08
21 that I can get what is supposed to come to me, my   02:10:27
22 payment.                             02:10:33
23   Q.   And after you called Evelyn, what   02:10:33
24 happened?                            02:10:37
25   A.   What I know is we meet each other at a   02:10:37

Page 68

1  certain place and then she picked up Angela and then   02:10:49
2  afterwards give me the $6,000.       02:10:57
3    Q.   Who gave -- when you say she gave me the   02:10:59
4  $6,000, who are you referring to?   02:11:03
5    A.   Ate Evelyn.                   02:11:04
6    Q.   And what form was the $6,000 in?   02:11:11
7    A.   The same thing, $100 bills totaling   02:11:14
8  6,000.                               02:11:32
9    Q.   Was anyone else present when Evelyn gave   02:11:33
10 you the $6,000?                      02:11:36
11   A.   None, only the two of us.   02:11:37
12   Q.   Where was Angela at that time, if you   02:11:49
13 know?                                02:11:52
14      MR. DELUCA:  Lacks foundation.  Calls for   02:11:55
15 speculation
16      THE WITNESS:  All that I know is she was far and   02:12:02
17 did not see us, and did not see us at all.   02:12:05
18 BY MS. LEAL:                         02:12:11
19   Q.   Okay.  I'm now -- Special Agent Palomino   02:12:11
20 is now placing before you what has been marked for   02:12:19
21 identification purposes as Government's Exhibit 10.  I   02:12:23
22 apologize.  I would ask that special Agent Palomino   02:12:38
23 place what has been marked for identification purposes   02:12:43
24 as Government's Exhibit 11.           02:12:45
25      (The document referred to was marked as   02:12:48

Page 69

1  Exhibit 11 for identification.)   02:12:50
2  BY MS. LEAL:                         02:12:50
3    Q.   Mr. Demafeliz, please take a moment and   02:12:58
4  look at Government's Exhibit 11 and tell me if you   02:13:01
5  recognize that person.               02:13:05
6    A.   Yes, it is Raquel Tollayan (phonetic).   02:13:09
7    Q.   How do you know Raquel?   02:13:18
8    A.   Ate Evelyn's brother called me and asked   02:13:20
9  me if it is possible, if it is possible to help her be   02:13:35
10 able to come because he needed a worker also.  He has   02:13:47
11 also facility.                       02:13:53
12      MR. DELUCA:  Move to strike as irrelevant.   02:13:55
13 BY MS. LEAL:                         02:13:58
14   Q.   Just one moment.  I'm just going to ask   02:14:00
15 the videographer --                  02:14:02
16      THE VIDEOGRAPHER:  It's okay.   02:14:02
17      MS. LEAL:  I thought there were some technical   02:14:05
18 difficulties.                        02:14:07
19 BY MS. LEAL:                         02:14:07
20   Q.   When you say Evelyn's brother called you,   02:14:09
21 do you know Evelyn's brother's name?   02:14:12
22   A.   Yes, Johnson.                 02:14:15
23   Q.   And what was your response to Johnson?   02:14:23
24      MR. DELUCA:  Object on the basis of relevance.   02:14:34
25      THE WITNESS:  Yes, we have a tournament and it   02:14:37

18 (Pages 66 to 69)

**EXHIBIT E
50**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 70

1  is possible.                                    02:14:43
2  BY MS. LEAL:                                     02:14:43
3      Q.   So did you agree to bring someone for   02:14:44
4  Johnson?                                         02:14:46
5      MR. DELUCA:  Objection.  Relevance.          02:14:51
6      THE WITNESS:  Yes.                           02:14:53
7  BY MS. LEAL:                                     02:14:54
8      Q.   And who did you agree to bring?         02:14:55
9      A.   Raquel Tollayan.                        02:14:58
10     Q.   What did you do, if anything, in order to  02:15:03
11 bring Raquel to Johnson?                         02:15:06
12     A.   The same way; I also trained her and also  02:15:08
13 provided certificates for her in preparation for  02:15:22
14 interview to be able to get a U.S. visa.         02:15:30
15     Q.   Okay.  And was Raquel able to get a U.S.  02:15:35
16 visa, do you know?                               02:15:41
17     A.   Yes, she was able to get one.           02:15:42
18     Q.   Do you know if she traveled to the United  02:15:50
19 States on that visa?                             02:15:53
20     A.   Yes, we were together in traveling to   02:15:54
21 here.                                            02:16:04
22     Q.   And when you say you traveled to here,  02:16:04
23 where did you travel to?                         02:16:07
24     A.   We were expected to come, so there's a  02:16:08
25 place where her brother and us met.              02:16:31

Page 71

1      Q.   When you say you came here, did you come  02:16:34
2  to the United States?  Did you come to a particular  02:16:40
3  city?  Where did you go?                         02:16:44
4      A.   We came here.  We came here to America.  02:16:47
5  We came together and then we met at a place that he has  02:17:05
6  indicated where we were going to meet.           02:17:10
7      Q.   And when you flew to America did you fly  02:17:12
8  to a particular city?                            02:17:15
9      A.   When we came here to LAX, I forget the  02:17:21
10 place, but we went to a place where Johnson indicated  02:17:37
11 that we were going to leave.                      02:17:42
12     MR. DELUCA:  Move to strike as hearsay.      02:17:45
13 BY MS. LEAL:                                      02:17:47
14     Q.   This place you met Johnson, what        02:17:47
15 happened?                                         02:17:52
16     A.   Raquel went with him and then he gave me  02:17:55
17 the payment of $6,000.                           02:18:06
18     Q.   Was anyone else present?                02:18:08
19     A.   No, only us.                            02:18:13
20     Q.   Okay.  Now special Agent Palomino is now  02:18:17
21 going to place before you what has been marked for  02:18:26
22 identification purposes as Government's Exhibit 10.  02:18:29
23     (The document referred to was marked as      02:18:32
24 Exhibit 10 for identification.)
25 BY MS. LEAL:                                      02:18:35

Page 72

1      Q.   Please take a moment and take a look at  02:18:39
2  that paragraph and tell me if you recognize the person?  02:18:41
3      A.   He is Jason De Guzman.                  02:18:44
4      Q.   How do you know Jason De Guzman?        02:18:52
5      A.   Ate Evelyn also called me regarding him  02:18:57
6  so he can go to the gym to train.                02:19:07
7      Q.   When Evelyn called you regarding Jason  02:19:10
8  De Guzman what did you say?                       02:19:17
9      A.   Send him over so that I can train him   02:19:18
10 because we have a competition that was coming.    02:19:32
11     Q.   So did you agree to bring Jason to the  02:19:35
12 United States?                                    02:19:38
13     A.   Yes.                                     02:19:39
14     Q.   What did you do in order to bring Jason  02:19:44
15 to the United States?                             02:19:47
16     A.   The same way training.  I trained him   02:19:48
17 every day and also the same way I provide the     02:20:05
18 certificates.                                     02:20:09
19     Q.   When you say you provided him           02:20:10
20 certificates, what are you referring to?          02:20:12
21     A.   Like certificates like black belt       02:20:14
22 certificate, the same ones I gave Angela.         02:20:28
23     Q.   Were they authentic certificates or was  02:20:31
24 the information false?                            02:20:34
25     A.   Not true.                               02:20:42

Page 73

1      Q.   Was Jason able to obtain a visa to travel  02:20:46
2  to the United States, do you know?               02:20:50
3      A.   Yes.                                     02:20:52
4      Q.   And do you know if he traveled to the   02:21:00
5  United States on that visa?                       02:21:03
6      A.   Yes.                                     02:21:05
7      Q.   How do you know that?                   02:21:13
8      A.   I met them at the airport at LAX when   02:21:15
9  they travel.                                      02:21:27
10     Q.   And when you say you met them, who are  02:21:28
11 you referring to when you say "them"?             02:21:31
12     A.   Him, Roletta, and Ron.                  02:21:32
13     Q.   Do you know Ron's last name?            02:21:49
14     A.   Nitura.                                 02:21:51
15     Q.   Okay.  I would now ask Special Agent    02:21:56
16 Palomino to place before Mr. Demafeliz what has been  02:22:01
17 marked for identification purposes as Government's  02:22:05
18 Exhibit 12.                                       02:22:08
19     (The document referred to was marked as      02:22:08
20 Exhibit 12 for identification.)
21 BY MS. LEAL:                                      02:22:10
22     Q.   Please take a moment and look at that   02:22:16
23 photograph and let me know if you recognize the person.  02:22:18
24     A.   He is Ron Nitura.                       02:22:26
25     Q.   And how do you know Ron Nitura?         02:22:28

19 (Pages 70 to 73)

**EXHIBIT E**
**51**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 74

1    A.    They were together in training and Ate    02:22:32
2  Evelyn asked me to help so they'll be able to    02:22:45
3    MR. DELUCA:  Hearsay.  Move to strike.    02:22:49
4  BY MS. LEAL:    02:22:50
5    Q.    And you said you met Ron and Jason at the    02:22:50
6  airport.  What airport are you referring to?    02:22:57
7    A.    Los Angeles International Airport.    02:23:00
8    Q.    After you met Ron and Jason and Roletta    02:23:14
9  at the airport, what did you do next, if anything?    02:23:18
10    A.    I called Ate Evelyn to meet two of them    02:23:21
11  and for what I remember I think it was at McDonald's    02:23:41
12  that we met.    02:23:45
13    Q.    Did you meet Evelyn at McDonald's?    02:23:46
14    A.    Yes.    02:23:50
15    Q.    And what happened when you met Evelyn at    02:23:54
16  the McDonald's?    02:23:58
17    A.    She gave me the payment for them and then    02:24:08
18  I left.  They went with Ate Evelyn.    02:24:15
19    Q.    And when you say Evelyn gave you the    02:24:19
20  payment, what did she give you?    02:24:22
21    MR. DELUCA:  Move to strike the last answer as    02:24:24
22  speculation.    02:24:26
23    THE WITNESS:  For what I remember is that I    02:24:52
24  received payment for one, which is 6,000, and what I    02:24:54
25  remember is that the 6,000 was sent to our house.    02:24:59

Page 75

1  BY MS. LEAL:    02:25:05
2    Q.    So are you saying -- when was the $6,000    02:25:07
3  sent to your house?    02:25:15
4    MR. DELUCA:  Calls for speculation.    02:25:18
5  BY MS. LEAL:    02:25:20
6    Q.    Was that prior to your meeting Jason and    02:25:20
7  Ron at the airport or after?    02:25:25
8    MR. DELUCA:  Lacks foundation.  Calls for    02:25:36
9  speculation.    02:25:39
10    THE WITNESS:  Before, because that was money    02:25:39
11  that we used for our transportation.    02:25:43
12  BY MS. LEAL:    02:25:46
13    Q.    Okay.  And you said you received $6,000    02:25:46
14  from Evelyn at the McDonald's.  In what form did you    02:25:51
15  receive that?    02:25:55
16    A.    The same way, $100 bills in an envelope.    02:25:57
17    Q.    Okay.  Going back to the $6,000 you    02:26:12
18  received at your home in the Philippines, how did you    02:26:16
19  receive it?    02:26:20
20    A.    For what I remember, it was delivered to    02:26:20
21  me, like delivered to me like door to door service.    02:26:36
22    Q.    After Evelyn gave you the $6,000    02:26:42
23  at the McDonald's what did you do, if anything?    02:26:52
24    A.    We separated from each other and then    02:26:59
25  they went with Ate Evelyn and then I left.    02:27:11

Page 76

1    Q.    When you say "they went with Evelyn," who    02:27:14
2  are you referring to?    02:27:17
3    A.    Ron Nitura and Jason De Guzman.    02:27:18
4    Q.    Since that moment that you left Jason and    02:27:29
5  Ron with Evelyn have you seen or heard from either of    02:27:34
6  them?    02:27:38
7    A.    No more.    02:27:39
8    Q.    Okay.  I'm now going to have Special    02:27:51
9  Agent Palomino place before you what has been marked    02:27:58
10  for identification as Government's Exhibit 13.    02:28:01
11    (The document referred to was marked as    02:28:04
12  Exhibit 13 for identification.)    02:28:06
13  BY MS. LEAL:
14    Q.    Please take a moment to look at that    02:28:13
15  photograph and let me know if you recognize the person.    02:28:15
16    A.    Yes, Kris De Guzman.    02:28:18
17    Q.    And how did you know Kris De Guzman?    02:28:28
18    A.    She was one of those that Ate Evelyn sent    02:28:37
19  to the gym for training so that they can leave and come    02:28:51
20  here.    02:28:55
21    Q.    And did you take Kris De Guzman to the    02:28:56
22  United States?    02:29:05
23    A.    No, because she failed the interview.    02:29:05
24    Q.    Did you attempt -- if you know, did she    02:29:20
25  attempt again to pass the interview test at the    02:29:23

Page 77

1  embassy?    02:29:29
2    A.    Yes.    02:29:30
3    Q.    Was she successful in passing it, if you    02:29:37
4  know?    02:29:40
5    A.    No, she was not able to pass.    02:29:40
6    Q.    Did you continue to try to assist Kris    02:30:13
7  De Guzman in coming to the United States?    02:30:17
8    A.    Yes, I continued, but then there was some    02:30:19
9  information, conversation, I believe a contact between    02:30:47
10  Jason and her not to continue coming, said that it    02:30:52
11  was -- it is not nice.    02:31:01
12    Q.    Tell me about your conversation with    02:31:02
13  Kris.    02:31:08
14    MR. DELUCA:  Calls for hearsay.    02:31:13
15    THE WITNESS:  Said she had a conversation with    02:31:16
16  Jason and said do not continue, don't try anymore to    02:31:38
17  come because your situation will not be a good one.    02:31:44
18    MR. DELUCA:  Move to strike as hearsay.    02:31:48
19  Actually double hearsay.    02:31:56
20  BY MS. LEAL:    02:32:00
21    Q.    Okay.  Mr. Demafeliz, you indicated that    02:32:02
22  you are acquainted with Darwin Padolina?    02:32:09
23    MR. DELUCA:  The question is vague.    02:32:21
24  BY MS. LEAL:    02:32:23
25    Q.    How are you acquainted with Darwin    02:32:23

20 (Pages 74 to 77)

**EXHIBIT E**
**52**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 78

1  Padolina?                                    02:32:26
2      A.   If I remember correctly, I believe that   02:32:26
3  the first time we met was at the McDonald's in Cubao.   02:32:43
4      THE INTERPRETER:  C-u-b-a-o.              02:32:48
5      THE WITNESS:  But all that we discuss about is   02:32:57
6  some beautiful places where they can go to.   02:32:59
7  BY MS. LEAL:                                  02:33:02
8      Q.   When you say you met Mr. Padolina at the   02:33:02
9  McDonald's in Cubao, is that in the United States or   02:33:04
10 somewhere else?                              02:33:08
11     A.   In the Philippines.                  02:33:16
12     Q.   And who was present at this meeting in   02:33:20
13 McDonald's?                                  02:33:24
14     A.   If I remember correctly, it was Ate   02:33:26
15 Evelyn, her husband, and I believe their youngest son.   02:33:50
16     Q.   And what was the purpose of this meeting   02:33:54
17 at McDonald's?                               02:33:57
18     MR. DELUCA:  Calls for speculation.       02:34:03
19     THE WITNESS:  They were asking my gym     02:34:05
20 and then I believe they mention a name of a person that   02:34:21
21 I can help, but I forget the name.           02:34:26
22 BY MS. LEAL:                                 02:34:30
23     Q.   When you say "they talked to me about the   02:34:31
24 gym and about a person I can help," who are you   02:34:36
25 referring to when you say "they"?            02:34:40

Page 79

1      A.   I was speaking with Ate Evelyn       02:34:42
2  regarding -- actually I asked regarding the first ones   02:34:59
3  who were able to come here, but that I know that she   02:35:10
4  was asking about the possibility of somebody coming   02:35:21
5  here, but I forgot who was it.               02:35:24
6      Q.   Okay.                              02:35:26
7      MR. DELUCA:  Move to strike as nonresponsive.   02:35:27
8  BY MS. LEAL:                                 02:35:30
9      Q.   And where was Darwin during the       02:35:30
10 conversation, this conversation with Evelyn?  02:35:33
11     A.   It is like we were talking to each other,   02:35:36
12 Ate Evelyn and myself across each other, and then they   02:35:53
13 were over on the side and he is together with their   02:35:57
14 son, but it was only Ate Evelyn and myself who were   02:36:01
15 talking to each other.                       02:36:05
16     Q.   Okay.  And have you met Darwin at any   02:36:06
17 other time?                                  02:36:11
18     A.   Actually that was the second time that we   02:36:12
19 met.  The last time was when I stayed over and slept at   02:36:25
20 their place.  When I woke up, I was lying down on the   02:36:31
21 couch and I saw Darwin, he got something from the   02:36:37
22 refrigerator.  I think it was food.  I don't know   02:36:46
23 whether he asked me to eat, but I know he said hello.   02:36:56
24 That was it.  And what I know is he went straight to   02:37:01
25 his work or to his job.                      02:37:08

Page 80

1      Q.   And why were you sleeping at Evelyn's   02:37:09
2  home?                                       02:37:14
3      A.   I believe I brought over one of my       02:37:14
4  assistants, Eileen, to try whether she can handle the   02:37:34
5  job.                                        02:37:42
6      Q.   And did Eileen stay at Evelyn's home to   02:37:42
7  work?                                       02:37:46
8      A.   I know that she stayed for only about two   02:37:57
9  weeks, but she's somewhat kind of sophisticated.   02:38:04
10     MR. DELUCA:  Move to strike as speculation.   02:38:09
11 BY MS. LEAL:                                 02:38:11
12     Q.   Mr. Demafeliz, from April 3, 2008 to   02:38:24
13 November 26, 2008 you were in federal custody related   02:38:28
14 to this case; is that correct?               02:38:32
15     A.   Correct.                          02:38:34
16     Q.   And were you held at the Metropolitan   02:38:41
17 Detention Center?                            02:38:50
18     A.   Yes, and I also stayed in San Bernardino   02:38:52
19 for 17 days.                                02:38:58
20     Q.   During your time in federal custody have   02:38:59
21 you had any contact with Evelyn Pelayo?      02:39:02
22     A.   When we had the -- I know that once we   02:39:07
23 were together then we came from the court, Roletta was   02:39:38
24 with us, I learned, and I was with my cousin, I learned   02:39:43
25 that she was working at the laundry.         02:39:55

Page 81

1      Q.   When you say you learned she was working   02:39:58
2  at the laundry, who are you referring to?    02:40:00
3      A.   Ate Evelyn.                        02:40:02
4      Q.   And how did you learn that?          02:40:08
5      MR. DELUCA:  Calls for hearsay.          02:40:12
6      THE WITNESS:  When we were together, I know that   02:40:16
7  she asked me if you needed clothes, then that's what I   02:40:23
8  remember.  And then very recently I received from her a   02:40:32
9  letter, but the letter was good.            02:40:42
10 BY MS. LEAL:                                 02:40:45
11     Q.   Okay.  I'm now going to place -- Special   02:40:45
12 Agent Palomino is going to place before you what has   02:40:51
13 been marked as -- for identification purposes as   02:40:54
14 Government's Exhibit 14 and 15.              02:40:57
15     (The documents referred to were marked   02:40:59
16 as Exhibits 14 and 15 for identification.)   02:41:01
17 BY MS. LEAL:                                 02:41:01
18     Q.   Please take a look at 14 and 15.  Take a   02:41:05
19 moment.  Let's look at 14 first.            02:41:10
20     Do you recognize what has been marked as   02:41:23
21 Government's Exhibit 14?                     02:41:28
22     A.   Yes.                             02:41:30
23     Q.   What is it?                        02:41:37
24     A.   This is the one that she wrote me and put   02:41:40
25 it in my socks.                             02:41:45

21 (Pages 78 to 81)

**EXHIBIT E**
**53**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 82

```
 1      Q.   When you say "this is the one she wrote   02:41:47
 2  me," who are you referring to when you say "she"?   02:41:50
 3      A.   Ate Evelyn.              02:41:55
 4      Q.   How did you receive this document from    02:41:58
 5  Evelyn?                          02:42:01
 6      A.   When our laundry bag returns this was     02:42:02
 7  tied to my laundry bag and then I tried to feel it and   02:42:26
 8  I know there was a letter.         02:42:32
 9      Q.   Where was it in your laundry bag?    02:42:34
10      A.   It was inside my -- it was inside the    02:42:38
11  sock and the sock was tied to the laundry bag.   02:42:51
12      Q.   And how do you know that this letter was   02:42:54
13  from Evelyn?                      02:42:57
14      A.   She was the only one who will do this and   02:42:59
15  she knows also the main cousin was able to come home   02:43:28
16  and she was the one who was giving me clothes.   02:43:31
17      MR. DELUCA:  Move to strike as speculation.   02:43:34
18  BY MS. LEAL:                      02:43:36
19      Q.   Do you recognize the handwriting?    02:43:38
20      A.   Yes.                     02:43:40
21      MR. DELUCA:  Lacks foundation.        02:43:46
22  BY MS. LEAL:                      02:43:48
23      Q.   How do you recognize this handwriting?   02:43:48
24      A.   The handwriting itself I don't know, but   02:43:50
25  then there is no other one who would send me this   02:44:03
```

Page 83

```
 1  letter.                          02:44:06
 2      MR. DELUCA:  Move to strike as speculation.   02:44:08
 3  BY MS. LEAL:                      02:44:10
 4      Q.   In this letter, is it signed by anyone?   02:44:10
 5      MR. DELUCA:  The document speaks for itself.   02:44:19
 6      THE WITNESS:  The only one that was indicated   02:44:23
 7  was from Ate.                     02:44:25
 8  BY MS. LEAL:                      02:44:27
 9      Q.   And do you know anyone by the name Ate?   02:44:27
10      A.   She is the only one that they refer to as   02:44:31
11  Ate Evelyn and she's the only one here at MDC.   02:44:40
12      MR. DELUCA:  Move to strike as speculation.   02:44:46
13  BY MS. LEAL:                      02:44:49
14      Q.   How did you feel after you received this   02:44:50
15  letter?                          02:44:51
16      MR. DELUCA:  Objection.  Relevance.   02:44:51
17      THE WITNESS:  I was sad, but actually it was   02:44:54
18  mixed.  I don't know.  Then I'm glad that she met the   02:45:12
19  God because of this.  I don't know what to do, but I   02:45:25
20  don't know how to be able to help me.    02:45:36
21      MR. DELUCA:  Move to strike as speculation with   02:45:39
22  regard to everything that was said including finding   02:45:42
23  God as a result of this.          02:45:45
24  BY MS. LEAL:                      02:45:47
25      Q.   Can you please look at what's been marked   02:45:47
```

Page 84

```
 1  as Government's Exhibit 15 and tell me if you recognize   02:45:49
 2  it.                              02:45:53
 3      A.   She wrote this to me.  All of this   02:46:02
 4  happened in November.             02:46:05
 5      Q.   When you say "she wrote this to me," who   02:46:06
 6  are you referring to?             02:46:10
 7      A.   Ate Evelyn.              02:46:10
 8      Q.   Earlier you stated that she gave you   02:46:16
 9  clothes.  How did you receive clothes from Evelyn?   02:46:19
10      MR. DELUCA:  Calls for speculation.   02:46:25
11      THE WITNESS:  Inside the laundry bag she put   02:46:37
12  new socks and then also blanket.     02:46:41
13      MR. DELUCA:  Lacks foundation.  Move to strike.   02:46:46
14  BY MS. LEAL:                      02:46:48
15      Q.   How do you know that those items were   02:46:48
16  from Evelyn?                      02:46:52
17      A.   Because even before she told me that she   02:47:00
18  works at the laundry and she was the only one who would   02:47:03
19  do that.                          02:47:07
20      MR. DELUCA:  Move to strike as speculation.   02:47:07
21      THE WITNESS:  My cousin is not there anymore.   02:47:09
22      MR. DELUCA:  Move to strike as speculation.   02:47:11
23  BY MS. LEAL:                      02:47:14
24      Q.   Did you ever receive extra clothes from   02:47:14
25  your cousin?                      02:47:16
```

Page 85

```
 1      MR. DELUCA:  Calls for speculation.   02:47:20
 2      THE WITNESS:  No.              02:47:24
 3  BY MS. LEAL:                      02:47:25
 4      Q.   Last week on November 26, 2008 you were   02:47:27
 5  transported to the United States District Courthouse   02:47:31
 6  for a deposition; is that correct?   02:47:36
 7      A.   Correct.                 02:47:40
 8      Q.   Was anybody else transported with you to   02:47:54
 9  this courthouse?                  02:47:57
10      A.   Yes, there were others who were with us.   02:47:58
11      Q.   Okay.  And when you say "us," who are you   02:48:08
12  referring to?                     02:48:11
13      A.   While we were getting out of MDC I saw   02:48:12
14  Ate Evelyn and she told me cancelled.  I did not   02:48:23
15  understand too well.  I did not say anything because it   02:48:29
16  is prohibited from talking to each other.   02:48:36
17      Q.   Did you have any other conversations with   02:48:38
18  Evelyn that day?                  02:48:42
19      A.   Yes, when we were brought to Spring here   02:48:43
20  in the van.                       02:48:55
21      Q.   And tell me what she said to you in the   02:48:56
22  van?                              02:48:58
23      MR. DELUCA:  Leading.  Calls for speculation.   02:49:03
24  Hearsay.                          02:49:09
25      THE WITNESS:  We were several conversations like   02:49:09
```

22 (Pages 82 to 85)

**EXHIBIT E**
**54**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

Page 86

1  in the van, but what I know like regarding the plan of   02:49:25
2  Angela, all of this is the planning of Angela and her   02:49:41
3  auntie, and because the continuation of our   02:49:47
4  conversation Ate said that whatever you said before,   02:49:51
5  stand by them.   02:50:00
6  BY MS. LEAL:   02:50:02
7    Q.   I'm sorry.  When you say -- can you --   02:50:02
8  you said that there were several conversations in the   02:50:13
9  van.  Can you tell me the first conversation in the   02:50:15
10  van?   02:50:18
11    A.   What we discuss, what we talk about,   02:50:19
12  there were many things.  I asked her who is her lawyer   02:50:46
13  and then I made sure that my cousin Roletta had left.   02:51:05
14    Q.   Mr. Demafeliz, I need you to be specific.   02:51:11
15  I would like you to tell me who spoke first in the van;   02:51:14
16  did you speak to her or did she speak to you?   02:51:18
17    A.   What I remember, she was in front, I was   02:51:20
18  behind.  She faced towards me and then I asked her   02:51:35
19  "what is the one that you were referring to as   02:51:43
20  cancelled?"  That's what I asked.   02:51:47
21    Q.   What was her --   02:51:50
22    A.   That's when our conversation started.   02:51:52
23    Q.   And what was her response?   02:51:54
24    A.   I was the one who asked what was the one   02:51:56
25  that was cancelled.  Yes, and she answered the meeting.   02:52:01

Page 87

1  And so I said that we will be staying here a long time,   02:52:11
2  it's really like that.  And I asked where are like   02:52:17
3  Jason, about where is Ruby, and she said they are gone.   02:52:34
4  And there's no way that they know and they told all the   02:52:54
5  information; no, they did not talk, they are not going   02:52:55
6  to say.  And I asked how did they know all the   02:53:05
7  happenings, and that happened.   02:53:17
8    Q.   And did she --   02:53:18
9    MR. DELUCA:  Move to strike as speculation.   02:53:19
10  Thank you.   02:53:21
11  BY MS. LEAL:   02:53:21
12    Q.   Did she respond to your question?   02:53:22
13    A.   What I remember is her saying there are   02:53:24
14  no strong evidences against the accusation.  And then I   02:53:40
15  remember asking her about the 6,000 that she sent me,   02:53:50
16  the one that was sent to my home, because I don't   02:53:56
17  really remember that one.   02:54:00
18    MR. DELUCA:  Move to strike as nonresponsive and   02:54:02
19  hearsay.   02:54:04
20    THE WITNESS:  And then that is not true, that   02:54:05
21  was just like hearsay.   02:54:09
22  BY MS. LEAL:   02:54:09
23    Q.   Who said that is not true, it's hearsay?   02:54:13
24    A.   Ate Evelyn.   02:54:16
25    Q.   Did she say anything else to you in the   02:54:20

Page 88

1  van?   02:54:23
2    A.   The continuation of our conversation and   02:54:23
3  that was longer was when we were at the tank and   02:54:37
4  the van trip was only a short one.   02:54:41
5    Q.   Okay.  So when you got to the tank at the   02:54:43
6  courthouse what did she say to you?   02:54:50
7    MR. DELUCA:  Calls for hearsay.   02:54:58
8    THE WITNESS:  We talk about the happenings and   02:55:02
9  that then she said she's aware that I have been to   02:55:10
10  San Bernardino and that I am back and then I sign a PD   02:55:14
11  that I am going home.  And then I said that I have not   02:55:23
12  spoken to my lawyer.   02:55:31
13    MR. DELUCA:  Move to strike as irrelevant.   02:55:35
14  BY MS. LEAL:   02:55:38
15    Q.   Mr. Interpreter, were you able to   02:55:38
16  translate the last portion?   02:55:39
17    A.   It is only my investigator that I speak   02:55:41
18  with.   02:55:48
19    Q.   When you said that -- you said that she   02:55:48
20  said that she knew you had signed a document, what   02:55:53
21  document did you say?   02:55:58
22    MR. DELUCA:  Calls for speculation.  Also   02:56:09
23  hearsay.   02:56:11
24    THE WITNESS:  The plea deal and that she said   02:56:15
25  she knows that I already sign, that I'll be going home.   02:56:17

Page 89

1  BY MS. LEAL:   02:56:22
2    Q.   Okay.  Did she make any other statements   02:56:22
3  to you in the tank?   02:56:25
4    A.   I had some doubt when she told me since   02:56:27
5  they know everything, I don't know, it seems that they   02:56:58
6  know everything.  Whatever they ask I'm going to answer   02:57:03
7  and tell them whatever is true.   02:57:09
8    Q.   Mr. Demafeliz, I'm sorry, I'm going to   02:57:12
9  interrupt.   02:57:14
10    MR. DELUCA:  First I want to interrupt you with   02:57:15
11  an objection.  Move to strike as nonresponsive.   02:57:16
12  Hearsay.  Speculation.  Thanks.   02:57:20
13  BY MS. LEAL:   02:57:22
14    Q.   Mr. Demafeliz, I just want to make sure   02:57:22
15  that you understand my question.  I'm asking you what   02:57:25
16  she said to you.  After you answer that I'll ask you   02:57:29
17  what you said to her.   02:57:35
18    So other than what you have already told   02:57:45
19  us, did she say anything else to you?   02:57:47
20    MR. DELUCA:  Calls for hearsay.   02:57:57
21    THE WITNESS:  She said whatever you said before,   02:57:59
22  stand by them because if you add some more then you may   02:58:11
23  have other problem.   02:58:14
24    MR. DELUCA:  Move to strike.  Hearsay.   02:58:16
25  Nonresponsive to the question.   02:58:18

23 (Pages 86 to 89)

**EXHIBIT E**
**55**

Rodolfo Ebrole Demafeliz, Jr. - 12/2/2008

---

Page 90

BY MS. LEAL:                                              02:58:20
1
2     Q.    After she said that to you, did you say       02:58:20
3  anything to her?                                        02:58:22
4     A.    I said I need to be able to speak to my        02:58:23
5  lawyer, so that I'll know, I'll understand what she was  02:58:37
6  talking about.                                          02:58:45
7     Q.    Okay.  And after you said that to her,         02:58:45
8  did she say anything else to you?                       02:58:48
9     MR. DELUCA:  Calls for hearsay and it's              02:58:58
10  irrelevant.                                             02:59:04
11     THE WITNESS:  I'm trying to recall.  All my         02:59:09
12  memories not that good.                                 02:59:11
13  BY MS. LEAL:                                            02:59:13
14     Q.    Okay.  Take a moment.                          02:59:13
15     A.    When I asked about her lawyer and I           02:59:32
16  asked, "Are we in the same category that we have a free  02:59:46
17  lawyer?"                                                02:59:52
18     "No," she said, "I paid a lot for my               02:59:54
19  lawyer."                                                03:00:01
20     MR. DELUCA:  Move to strike as irrelevant.          03:00:01
21     THE WITNESS:  And I said, "Well, I cannot afford   03:00:05
22  it and I think when I get back I will not have any more  03:00:11
23  job."  I cannot remember too well the others.          03:00:15
24     MS. LEAL:  Okay.  If the parties agree we can go   03:00:55
25  off record.  I believe the videographer indicated there  03:01:14

Page 91

1  is about three minutes left on the tape.               03:01:18
2     MR. DELUCA:  We don't have a choice.                 03:01:20
3     THE VIDEOGRAPHER:  This marks the end of           03:01:22
4  videotape number two in the deposition of Rodolfo       03:01:24
5  Demfeliz, Jr.  We are off the record at 3:01 p.m.       03:01:29
6     (Recess taken.)                                     03:01:35
7     THE VIDEOGRAPHER:  Here begins videotape number    03:13:16
8  three in the deposition of Rodolfo Demafeliz, Jr.  We   03:13:32
9  are back on record at 3:13 p.m.                         03:13:35
10     MS. LEAL:  No further questions for               03:13:39
11  Mr. Demafeliz.                                          03:13:41
12
13     EXAMINATION                                         03:13:42
14
15  BY MR. DELUCA:
16     Q.    Good afternoon, Mr. Demafeliz.  My name      03:13:43
17  is Philip Deluca.  I'm going to be questioning you on   03:13:47
18  behalf of my clients, Darwin Padolina and Evelyn       03:13:50
19  Pelayo.                                                 03:13:53
20     A.    Yes.                                           03:14:04
21     Q.    My first question is do you still have        03:14:04
22  the Government's exhibits in front of you?              03:14:07
23     A.    Yes.                                           03:14:10
24     MS. LEAL:  Mr. Deluca, I'd ask what exhibit        03:14:15
25  you're referring to.                                    03:14:18

Page 92

1     MR. DELUCA:  Well, I was asking if he had all of   03:14:19
2  them in front of him and I was going to ask him         03:14:26
3  specifically about number 1.                            03:14:27
4     MR. NICOLAYSEN:  It's the plea agreement.           03:14:32
5     THE WITNESS:  Yes.                                   03:14:38
6  BY MR. DELUCA:                                           03:14:38
7     Q.    Okay.  Mr. Demafeliz, do you understand       03:14:38
8  the difference between the truth and a lie?             03:14:41
9     A.    Yes.                                           03:14:51
10     Q.    Yes.  Okay.  Now, you testified earlier      03:14:51
11  that you have met Darwin Padolina twice, correct?      03:15:00
12     A.    Correct.                                       03:15:04
13     Q.    Okay.  Let me ask you this.  I'd like to     03:15:09
14  call your attention to your plea agreement and          03:15:12
15  specifically I would like to call your attention to     03:15:19
16  page 3 beginning at line 24 to page 4, line 3.  I'd    03:15:25
17  like you to read that paragraph beginning on page 3,    03:15:34
18  line 24 to page 4, line 3.  Let me know when you're    03:15:39
19  finished reading it.                                    03:15:53
20     THE INTERPRETER:  Do you want me to interpret it   03:15:57
21  for him?                                                03:16:00
22     MR. DELUCA:  Sure.                                  03:16:03
23     (The document was translated for the witness.)     03:16:34
24  BY MR. DELUCA:                                          03:17:06
25     Q.    So are you comfortable with what it says     03:17:07

Page 93

1  there beginning on line 24 of page 3 to page 4, line 3?  03:17:10
2     A.    The only thing that concerns me about        03:17:16
3  here is about Darwin, we did not talk to each other     03:17:48
4  regarding this thing.                                   03:17:52
5     Q.    Okay.  But everything contained in your      03:17:57
6  plea agreement is true, correct?                        03:18:01
7     A.    Yes.                                           03:18:03
8     Q.    Okay.  So -- and you know there's an         03:18:12
9  indication that you have already testified that you signed  03:18:15
10  this document on September 24, 2008, correct?          03:18:18
11     A.    Correct.                                       03:18:22
12     Q.    And nobody forced you to sign this plea      03:18:28
13  agreement, true?                                        03:18:31
14     A.    Yes.                                           03:18:32
15     Q.    And you signed this plea agreement           03:18:37
16  because you want to go home, right?                     03:18:39
17     A.    Yes.                                           03:18:41
18     Q.    Okay.  So -- and your understanding is by    03:18:45
19  signing this plea agreement you're going to get to go   03:18:49
20  home to the Philippines, true?                          03:18:52
21     MS. LEAL:  Objection.  Misstates testimony.        03:18:55
22     THE WITNESS:  Yes.                                   03:18:56
23  BY MR. DELUCA:                                           03:19:00
24     Q.    Okay.  And so irrespective of what it       03:19:00
25  says in this document, you signed because you want     03:19:03

---

24  (Pages 90 to 93)

**EXHIBIT E
56**